BLANCHARD, J.
Plaintiff sues as the surviving widow of George Potts. Her action is one sounding in damages on account of his death, which she charges to the negligence and omission of duty of the defendant corporation. She asked judgment for $25,-000.00.
*4 The jury that sat upon the case returned a verdict for $5,000, and from the judgment based thereon defendant appeals.
Her husband was 27 years of age when he met his death and she had been married to him only about eight months.
When killed he was foreman of a line gang operating for the Cumberland Telephone Company at Shreveport, La., and* engaged at the time in stringing wires. He was earning a salary of sixty-five dollars per month.
Under a franchise granted by the City of Shreveport defendant company operates a double track electric street railway on Texas Avenue in said City. It is the overhead trolley system. There is a> trolley wire over-each track. They are suspended by wires spanning the street and these are called span wires.
These span wires are attached to wooden poles placed opposite each other on the two sides of the street. The trolley wires are made fast to the span wires by means of what are called “hangers” or “ears.” The latter name is given them, supposedly, because in shape and appearance they somewhat resemble an ear.
These hangers or ears are insulated, the purpose being to confine the current qf electricity, which propels the cars, to the trolley wire. Were it otherwise each span wire would be a “live,” or “hot” wire, charged with the same voltage of electricity that the trolley wire is. This would result in so much leakage of the electrical current as to impair its efficiency in the work of operating the cars, and would, besides, render each span wire dangerous.
The Cumberland Telephone Company, also under a franchise from the City, occupies the sides of Texas Avenue with its poles and wire. On cross-arms attached to its poles it maintains and operates numerous wires on and along the street.
The electrical current with which telephone wires are charged is too weak to be dangerous to human life. But the current with which the trolley of the car company is charged is of deadly potency.
Potts, the dead man, was the employee of the telephone company — not of the car company. His death was occasioned by the telephone wire he was stringing coming in contact with a span wire of the car company. This span wire, notwithstanding its connection with the trolley wire, should have been, through proper insulation, harmless. But it was not. It was deadly dangerous. The insulation at the hanger or ear was gone, if it had ever existed, and the wire was alive with, likely, the same voltage of electricity as was passing over the trolley.
This being so the instant the telephone wire touched it — one end of the wire being on the ground thus completing the circuit— it (the telephone wire) became likewise charged with the deadly current.
Potts, at the time, had hold of the wire he was stringing-. It was the wire that came in contact with the span wire. The current was, thus, communicated to him and the shock killed him instantly.
The petition charges negligence in defendant in exposing its wires without insulation or protection at a point or place where it was known plaintiff’s husband and others would be required to work and be exposed to contact therewith.
The answer is a general denial, coupled with a plea of contributory negligence on part of the deceased.
The contention of the plaintiff is that to the absence of insulation protecting the span, wire from inoculation by the current of electricity the trolley wire was conveying, is the death of her husband immediately attributable; that the proximate cause of his death was the condition of this span wire — heavily charged with electricity; that it was the duty of defendant to prevent this, and as a safe-guard against possible defective insulation it was its further duty to provide guard wires over each span wire; that had guard wires been so placed the telephone wire would not have come in contact with the span wire and her husband would not have met with untimely and violent death.
The contention of the defendant is that the dead man was an experienced and skilled electrician and lineman and was well aware of the perils incident to the handling of wires in the City of Shreveport; that he had knowledge of the fact that the span wire in question was a live wire and knowing this should have declined service at that point until it was made harmless by insulation, or else going- on with his work, *6 should have taken the precautions necessary to shield himself from harm; that there were various means by which he could have protected himself from contact with the dangerous wire, none of which he resorted to; •and that, failing in this, he was guilty of that degree of carelessness and neglect which bars recovery.
In stringing the telephone wire Potts had with him two assistants, Whitworth and Holt. He was up on the pole to which the wire was to be strung. In close proximity was the span wire in question. That it was heavily charged with electricity there is no ■doubt. The death of Potts attests this fact. That it was so charged is dpie to the fact that it had no insulation to protect it from the trolley wire. The testimony leaves -no doubt whatever of this.
The wire Potts was stringing had been passed over the span wire. This had been accomplished by means of a rope. Whit-worth was westward of the pole Potts was ■on. Under instructions from Potts he was 'pulling the wire which was being strung. This pulling of the wire kept it taut, and while taut it was free from contact with the span wire. But Whitworth stumbled and this circumstance caused a slackening of the wire. This slackening brought it in contact with the span wire and immediately it be-came charged with the deadly current.
So deadly was this current that when Potts was shocked and hung suspended, Whitworth, rushing up to the end of the wire touching the ground, in the generous effort to pull it away from Potts, seized it and was himself instantly killed.
One witness (Clanton), called by the defense, testifies the telephone wire came in direct contact with the trolley wire, leaving the inference that it got its charge of electricity from the trolley. But the great preponderance of testimony is that it rested not against the trolley wire, but on the span wire, about half way from the pole to the trolley.
It is true, Potts was aware the span wire near him was a “hot” wire, but to what extent it was charged with the electrical current he did not know.
The fact that he knew there was, at that point, leakage from the trolley wire to the .span wire, and yet continued working there, was dot, of itself, negligence barring recovery. Beach on Contributory Negligence (2d Ed.) pp. 44 and 50.
He could still work there notwithstanding knowledge of the hot span wire, and would not be chargeable with negligence unless he failed to take due precaution and exercise due care to shield himself from harm.
This is not a case of a master furnishing defective appliances to do his work and which the servant, knowing the defect and danger, proceeded, -notwithstanding, to do the work, thus assuming the risk. Potts was not the servant of the car company and it was the latter’s span wire that did the mischief.
In Clements v. La. Electric Light Co., 44 La. Ann. 692, 11 South. 51, 16 L. R. A. 43, 32 Am. St. Rep. 348, this Court held that when a person is employed in the presence of a known danger, to constitute contributory negligence it must be shown that he voluntarily and unnecessarily exposed himself to the danger.
It is not contributory negligence to engage in a dangerous occupation. Such was the ruling of this Court in Myhan v. Electric Light and Power Co., 41 La. Ann. 969, 6 South. 799, 7 L. R. A. 172, 17 Am. St. Rep. 436. See, also, Beach on Con. Neg. 370; Wood, 763.
It did not appear to the satisfaction of the jury that Potts had unnecessarily exposed himself to the existing danger in executing the work he was called on by his employers, the Telephone Company, to do. It did not appear to them that he had failed to take due precaution to shield himself from danger.
In this we are not prepared to say the jury erred.
Potts had the necessary assistance to enable him to do the work he was engaged in with safety to himself and them.
But for the unforeseen occurrence of Whit-worth stumbling and letting the wire slack, the accident would not have happened. Potts was keeping himself “in the clear” — that is, from contact with the dangerous circuit. He was doing this by keeping the wire he was holding off the dangerous span wire. So long as his assistant did not stumble he was safe, and because he could not and did not foresee that his assistant would stumble, he .is not chargeable with contributory negligence.
Nor is it a case where the principle involved in “the fellow servant doctrine” may *8 be invoked. Whitworth was his fellow servant in the Telephone Company’s employ, but neither of them was the servant of the car company to whose benefit the doctrine would enure, if applicable. The appliance (the span wire) which caused the harm was the property of the car company and the danger arising from it was due to the neglect of the latter. The prime cause of Potts’ death was not Whitworth’s stumble. It was the “live” span wire of defendant company. Had that wire been a “dead” one in the sense that it was not charged with electrical current, the stumble of Whitworth would not have resulted in his death.
A company maintaining electrical wires over which a high voltage of electricity is conveyed, rendering them highly dangerous to others, is under the duty of using the necessary care and prudence at places where others may have the right to go either- for work or pleasure, to prevent injury. It is the duty of the company under such conditions to keep its wires perfectly insulated, and it must exercise the utmost care to maintain them in this condition at such places.
Joyce Electrical Law, Secs. 445, 517.
And a company maintaining such wires must see to it that their lines are safe for those who by their occupation are brought in close proximity to them.
Clements v. Electric Company, 44 La. Ann. 692, 11 South. 51, 16 L. R. A. 43, 32 Am. St. Rep. 348; Overall v. Louisville Electric Light Company (Ky.) 47 S. W. 442; Brown v. Edison Illuminating Co. (Md.) 45 Atl. 182, 46 L. R. A. 745, 78 Am. St. Rep. 442.
In the instant ease the fact of the span wire being heavily charged by leakage from the trolley wire subjected the workman to greater risks than those which fairly belong to the employment he was engaged in. 41 La. Ann. 969, 6 South. 799, 7 L. R. A. 172, 17 Am. St. Rep. 436.
Eor this defendant must be held liable under the circumstances disclosed. The live span wire was the proximate cause of Potts’ death. It ought to have been a harmless wire and would have been with proper insulation.
It was the duty of defendant company to have ascertained the unsafe and dangerous condition of its span wire at that point and to have remedied the same. The fact that frequent inspections of the line were made to-ascertain the condition of the wires and to-remedy defective insulation does not relieve the company of liability. If the span wire had become dangerously charged with the electrical current the company’s inspection should have been thorough enough to have-detected it.
Using an agency of such subtle and dangerous power as electricity, the -burden of' the utmost care and vigilance to keep all wires connected with the trolley perfectly insulated was upon the company. It was its’ business to hnow the span wire in question was a “live” wire through leakage from the-trolley which it suspended.
“The knowledge which they ought to have had,” said this Court in Myhan v. Electric Co., 41 La. Ann. 968, 6 South. 799, 7 L. R. A. 172, 17 Am. St. Rep. 436, “the law presumes,. juris et de jure, they had.”
And in that case it was further said that even had the company’s representatives sworn-they did know of the dangerous condition of the wires such ignorance would not have-exculpated them; that a superior is presumed to know, and in law knows, that which it is-his duty to know, viz.: — whatever may endanger the person and life of his employee in-the discharge of his duties.
These observations of the Court in theMyhan case apply with more force here by reason of the fact that Potts (the man killed) sustained no contractual relation with defendant company. He was not in its en> ploy. He was the servant of the Telephone Company, which had the right to he upon the street with its poles and wires and servants in the lawful and legitimate pursuit of its business.
Defendant company knew that the employees of the Telephone Company must needs be in the street and on the poles and among the-wires in the discharge of their duties. It knew that wires for the telephone service were constantly being strung, and since there-was joint occupancy of the street by the two companies with their poles and wires and servants, it was all the more incumbent upon that one of the companies whose wires carried the deadly current to see to it that its-transmission was effected with safety to all concerned.
*10 It requires a powerful voltage of electricity to propel street cars. The agent for the transmission of this power is the -trolley wire. The current should he kept confined to it. TIad this been done and the employees of the telephone company had been so careless as to get the wires they were stringing mixed up with the trolley wire and injury or death resulted, there could be no recovery.
But it is different as regards the span wires suspending the trolley. It is the duty of the ear company to keep these immune from electrical contagion, free from dangerous and deadly electrical energy. The telephone wires being strung over the span wires iire liable to come in contact with them no matter how careful those engaged in stringing such wires may be. And where they do •come in contact it should be a harmless contact and would be a harmless one were the span wires kept free from the electrical current.
Such is intended to be and should be their usual condition. When it is otherwise and injury or death ensues to those who have not accepted such risks, owners of the offending wire must stand the responsibility.
It is in evidence that the primary object of •car companies in insulating their span wires is to confine the electrical energy to the trolley, to prevent its escape by leakage, and, thus, keep unimpaired the efficiency of the power which drives the cars. But courts of justice will not consider this the primary object of such insulation where danger to human life lurks in span wires. They will consider the primary object of the insulation to be to obviate such danger, and the efficient propulsion of the cars a secondary object.
Judgment affirmed.