We overlooked several small items of costs, which should have been allowed.

It is therefore ordered that our former decree be amended as follows, viz.: By recognizing Owen Reidy as an ordinary creditor for the sum of $3,314.66, less $298.57 and $1,825, with legal interest on the balance from May 5, 1902, and for the further sum of $59.80 costs paid; and by recognizing Mrs. Owen Reidy as an ordinary creditor for the further sums of $48.80 and $146, costs paid.

And it is further ordered that with the above modifications of our decree the application for a rehearing be refused.

---

(36 South. 414.)

No. 14,963.

WHITWORTH et al. v. SHREVEPORT BELT RY. CO.

(Feb. 29, 1904.)

INJURY TO EMPLOYÉ—CONTRIBUTORY NEGLIGENCE—EVIDENCE.

1. Potts and Whitworth, employés of the telephone company, were engaged in stretching a line of that company upon its poles. In doing so, the line had to be passed above a span of the electric car system. Potts, upon the telegraph pole, was holding one end of the wire, while Whitworth, upon the ground, was holding the other. The latter stumbled, and in doing so dropped his end of the wire, which fell to the ground, resting upon the span wire below, which, by reason of defective insulation in the hanger by which the trolley wire and the span wire were connected, was heavily charged with electricity. Potts, holding the other end of the wire, instantly received a shock, and fell head foremost, but his spurs caught on a spike on the telephone pole, and he hung suspended in the air. Whitworth ran to his relief, and, catching hold of the wire of his own company, which he had been using, to do so, he himself was instantly killed.

*Held*, that Whitworth, in going to the rescue of Potts, was not in fault, but was acting under a high sense of moral duty, and for his death while engaged in performance of that duty, occasioned by the negligence of the electric company, it is responsible in damages. Corbin v. City of Philadelphia, 45 Atl. 1070, 195 Pa. 461, 49 L. R. A. 715, 78 Am. St. Rep. 825; West Chicago Street R. R. Co. v. Liderman (Ill.) 58 N. E. 367, 52 L. R. A. 655, 79 Am. St. Rep. 226; Becker v. L. & N. R. R. (Ky.) 61 S. W. 997, 53 L. R. A. 267.

(Syllabus by the Court.)

Appeal from First Judicial District Court, Parish of Caddo; Alfred Dillingham Land, Judge.

Action by C. E. N. Whitworth and another against the Shreveport Belt Railway Company. Judgment for plaintiffs, and defendant appeals. Affirmed, with reduction to $5,000.

Wise, Randolph & Rendall, for appellant. Alexander & Wilkinson and Shepherd & Land, for appellees.

Statement of the Case.

NICHOLLS, C. J. This action is brought by Mrs. Carrie E. Nola Whitworth, the widow of P. B. Whitworth, in her own behalf, and by Lester Allen Whitworth, the minor son of P. B. Whitworth, represented by his guardian, G. W. Prewitt. A judgment is prayed for in favor of each of the plaintiffs for $15,000.

It is alleged that P. B. Whitworth, the husband of one of the plaintiffs, and the fa-

ther of the other, was killed on August 1, 1901, in the city of Shreveport, by an electric shock communicated to his body from the electric wires of the Shreveport Belt Railway Company; that his death was solely due to its utter and wanton negligence in operating a street railway by means of an overhead wire on Texas avenue, without proper insulation, and permitting defective insulations of the trolley hangers to remain in such condition that the current freely passed to the span wire, and thus communicated with the telephone wire, which said Whitworth was engaged in stretching on poles parallel to the said railway company track, and by the shock from which Mr. Potts, who was on the telephone pole, 40 feet from the ground, was shocked and killed. Plaintiffs showed that in the effort to save the life of Potts, who was hanging helpless on the telephone pole as a result of a shock from an electric current transmitted to the telephone wire from the span wire of defendant company, said P. B. Whitworth received a shock which caused him intense agony and pain, and resulted in his death; that said P. B. Whitworth attempted to pull the wire from the body of Potts when he received the shock. They showed that said P. B. Whitworth was a young man, 24 years of age, earning $50 per month, supporting his wife and child; that by the reckless indifference of the said railway company to the safety of the public, and their wanton negligence, Carrie Whitworth and Lester Allen Whitworth were deprived of the support of their husband and father.

That the pain and agony of P. B. Whitworth before death, after receiving the electric shock, was intense; that said P. B. Whitworth was without fault; and that his death was due entirely to the wanton negligence of defendant company.

In view of the premises, they prayed for service of citation and petition on said Shreveport Belt Railway Company, through its president, Walter B. Jacobs, to answer to the demand of Mrs. C. E. N. Whitworth for damages for the pain and suffering, death, and loss of support of her husband, P. B. Whitworth, by said defendant company, in the full sum of $15,000, and the demand of George Prewitt, guardian of Lester Allen Whitworth, son of P. B. Whitworth, for damages to said minor in the full sum of $15,000 in the pain, suffering, and death, and loss of support, occasioned to said minor by the careless killing of his father by said defendant company, and for all necessary orders and general relief.

The defendant pleaded the general issue. Further answering, it averred that if the alleged company or its employés were guilty of any negligence, and that if the appliances used by it were defective in any way, which was denied, P. B. Whitworth was guilty of contributory negligence which resulted in his death, and he cannot recover.

It was agreed between counsel that the evidence taken in the suit of Mrs. Birdie Potts v. Shreveport Belt Railway Co. should be used on the trial of this cause, with the right of either party to introduce other evidence.

The jury returned a verdict against the defendant in favor of Mrs. Carrie E. Whitworth for $3,500, and against the defendant in favor of Lester Allen Whitworth for $2,500.

Defendant appealed.

This case is the sequel of that of Mrs. Birdie Potts v. Shreveport Belt Railway Co., reported in 110 La. 1, 34 South. 103, in which the plaintiff recovered a judgment against the defendant for damages resulting from the death of her husband through its negligence. The following facts are extracted from the report of that case: When Potts was killed he was in the employ of the Cumberland Company, as foreman of a line gang, in stringing its wires upon the poles of that company. In stringing the wires, Potts had with him two assistants, Whitworth and

Holt, also in the employ of the telephone company. Under a franchise granted by the city of Shreveport, the defendant company was operating a double-track electric railway on Texas avenue, in that city. It was the overhead trolley system. There was a trolley wire over each track. They were suspended by wires spanning the street, called "span wires." These were attached to wooden poles placed opposite each other on the two sides of the street. The trolley wires were made fast to the span wires by means of what are called "hangers" or "ears." These hangers should be insulated, the purpose being to confine the current of electricity which propels the cars to the trolley wire. Were it otherwise, each span wire would be a "live" or "hot" wire, charged with the same voltage of electricity that the trolley wire had. This would result in so much leakage of the electrical current as to impair its efficiency in the work of operating the cars, and would, besides, render each span dangerous. The Cumberland Telephone Company, also, under a franchise from the city of Shreveport, was occupying the sides of Texas avenue with its poles and wires. On cross-arms attached to its poles it maintained and operated numerous wires on and along the streets.

The electric current with which telephone wires are charged is too weak to be dangerous to human life, but the current with which the trolley of the car company is charged is of deadly potency. Potts' death was occasioned by the telephone wire he was stringing coming in contact with a span wire of the car company.

This span wire, notwithstanding its connection with the trolley wire, should have been, through proper insulation, harmless. But it was not. It was deadly dangerous. The insulation at the hanger or ear was gone, if it had ever existed, and the wire was "alive" with likely the same voltage of electricity as was passing over the trolley. This being so,

the instant the telephone wire touched it, one end of the wire being on the ground, thus completing the circuit, it (the telephone wire) became likewise charged with the deadly current. At the time Potts was killed, he was up on the pole to which the wire was to be strung. In close proximity was the span wire of the defendant. That it was heavily charged with electricity, there was no doubt. The death of Potts attested this fact. That it was so charged was due to the fact that it had no insulation to protect it from the trolley wire. The wire Potts was stringing had been passed over the span wire. This had been accomplished by means of a rope. Whitworth was westward of the pole Potts was upon. Under instructions from Potts, he was (on the ground) pulling the wire which was being strung. This pulling of the wire kept it taut, and while taut it was free from contact with the span wire. But Whitworth stumbled, and this circumstance caused a slackening of the wire. This slackening of the wire brought it in contact with the span wire, and immediately it became charged with the deadly current. So deadly was the current, that, when Potts was shocked, and hung suspended, and Whitworth, rushing up to the end of the wire, and, touching the ground in the generous effort to pull it away from Potts, seized it, he was himself instantly killed. This court held in the Potts Case that the defendant was negligent, and rendered judgment in favor of the plaintiff against it. We are called on to determine whether the plaintiffs in this case are entitled to damages for the death of Whitworth.

Defendant's counsel, in their statement of facts, referring to the Potts Case, say: "It will be remembered that Potts, with Holt and Whitworth, were engaged in stringing a telephone wire along Texas avenue, in the city of Shreveport. At the time of his death, Potts was at the top of a pole, endeavoring to place the wire above the span wire of the

defendant company. Whitworth, on the ground, had hold of one end of the telephone wire, pulling the wire, when he stumbled, letting go the wire, when it fell on the span wire, which was charged with electricity from the trolley wire, occasioned from defective insulation. It seems that Potts fell and died the moment Whitworth stumbled and let go the wire."

The admissions so made as to the negligence of the defendant company bring the issues involved in this case within very narrow compass. It is conceded on both sides that, as soon as Potts received from the telephone wire the electric shock by which he was killed, he immediately fell head downward from the point where he was standing, and, his spurs catching upon one of the spikes on the pole, remained suspended in the air, and that Whitworth, after stumbling and losing hold of his end of the telephone wire, took hold of it again, and was instantly killed.

The plaintiffs urge that in so doing he could not be held guilty of negligence, as his act was in aid of an attempt to save the life of his companion and fellow workman, Potts, and any others who might incautiously come in contact with the telephone wire, which was hanging suspended from the span wire.

Defendant contends that it was evident to all who witnessed the unfortunate occurrence that Potts was dead when Whitworth caught hold of the wire, and fell dead instantly; that when Potts received the electric shock, and fell from the top of the pole, head down, hanging by his spurs, Holt (one of his assistants) realized that he could do nothing for him but to begin preparations for his interment; that, when he started to ring for assistance to take Potts down, he warned Whitworth not to touch the wire, then down in the mud; that the action of Whitworth was not to save human life, for Potts was manifestly dead several minutes before he took hold of the wire; that others saw it,

and he must have seen it, and, moreover, he was warned not to touch the wire by several persons; that, in disregard of this warning, Whitworth, a telephone lineman himself, caught hold of the wire and dropped dead; that his conduct was rash, and recovery cannot be had in the case; that the doctrine held by Rorer on Railroads is to the effect that "it is not a wrongful act to make an effort to save a human life if the effort made be compatible with a reasonable regard for one's own safety"; that the same doctrine is announced in Thompson on Negligence, vol. 2, p. 1174, § 21, and in Peyton v. Pacific Railway Co., 41 La. Ann. 861, 6 South. 690, 17 Am. St. Rep. 430.

Counsel of plaintiff, on the other hand, contend that Whitworth met his death in the attempt to rescue one who was in imminent and deadly peril through the negligence of the defendant; that the spectators were thrown into a state of great excitement by the horrible sight; some hastened to telephone the power house to turn off the current; some cried out, "Cut the wire;" others, "Don't touch the wire;" that Whitworth, seeing his comrade in that horrible predicament, sizzling and frying to death, and hanging head down 40 feet in the air, attempted to cut the telephone wire, and was killed. Counsel say: "Defendant company adopts the only possible defense open to it—that Whitworth was grossly reckless and imprudent; that his widow and child should be denied damages for his death. It has been held that it must be an extreme case to justify refusing damages in a matter of this nature on the ground of the recklessness of the rescuer. This is based on the theory that it is frequently impossible to rescue one in imminent peril without sharing in the danger. It has been further held that due allowance must be made for the excitement caused by the sight of a fellow creature losing his life, and that the danger must not be measured after it is passed, by one who was not pres-

ent, in apothecary's scales, to determine whether the rescuer exposed himself to more danger than was prudent."

What can be more dangerous than to throw one's self in front of the wheels of a rapidly approaching train? Yet this court, in Peyton v. Railway Co., 41 La. Ann. 861, 6 South. 690, 17 Am. St. Rep. 430, refused to hold that his efforts to save another were so rash, under such circumstances, as to debar his recovery, saying that the appreciation of the value of human life was so great, and the admiration for heroism so universal, that we know of no case where the court had withheld damages under circumstances like that before it. Counsel say:

"The judgment in the case at bar might be well based on the principle that in such a case the rescuer is attempting to save the company from the consequences of its own negligence, and it is not for the company to theorize as to how it might have been done more prudently and with less danger.

"Had Whitworth been successful in rescuing his friend, the defendant would have reaped the benefit of his act. He failed, and lost his own life, and it strikes us that it comes with poor grace from the defendant to say he was negligent, and should not have acted with imprudence. There was intense excitement at the place of the accident. The wires were lying loose in a public street, and the excited citizens were crying, 'Cut the wire,' and others, 'Don't touch the wire;' and, in the midst of these exclamations, Whitworth attempted to cut the wire, either for the purpose of saving his friend Potts, or to attempt to get it out of the street, and was himself killed. There was no time for reflection. There was no opportunity for deciding the best course to pursue, and he acted on the moment in the way to him seemed best. According to defendant's counsel, Whitworth should have differentiated between the extreme danger which, under the cases, he could risk, and the imprudence which he must avoid.

"That others thought there was a chance to save Potts is shown by the fact that they telephoned defendant's power house to turn off the current, and still others advised the cutting of the wire. It all happened in less time than it takes to tell it. Under such circumstances, what was more natural than for the deceased to attempt to cut the wire? Admitting that there was great danger in the attempt, still there was a chance that it might be done without being injured, and it might have saved the life of his companion. As long as there was a chance to save human life or to prevent injury to others, no court will say that he was recklessly imprudent, particularly against him whose negligence was responsible for the situation.

"If there was excitement, and, through panic and fear, reason had lost its proper sway, this excitement was caused by the defendant's negligence, and that, then, would be the primary cause of the accident, and it would still be liable. See Thompson on Negligence, § 197, for a full exposition of the law. This author says: 'If A. acts erroneously under the influence of a sudden impulse of fear, or in consequence of a sudden appearance of danger, caused by the negligence of B., A. may recover damages of B., although, if A. had not so acted, he would not have been hurt.'

"This court, in the case of Potts v. Railway Co., 110 La. 1, 34 South. 103, having held that Potts was without fault, and having awarded his widow damages for his death, it therefore was res judicata that the defendant was negligent, and that Potts was acting with care. Therefore Whitworth was attempting to save his friend, who was without fault, from the consequences of the negligence of the defendant.

" 'If the condition be such as shows imminent danger of serious injury or death, the

rule is to be applied to the act out of which the contributory negligence is claimed to arise, and, when coupled with the negligence of another in producing the condition, it will be quite an extreme case which defeats recovery by the court on the ground of contributory negligence. [Gibney v. State] 137 N. Y. 1 [33 N. E. 142, 19 L. R. A. 365, 33 Am. St. Rep. 690]; [Linnehan v. Sampson] 126 Mass. 506 [30 Am. Rep. 692]; Manthey v. Rauenbuehler (Sup.) 75 N. Y. Supp. 716.'

"In the same case the court further said: 'It is not a case in which fine distinctions can be made as to the position of the truck, the speed of the horse, and the danger which confronted unless stopped.' Id. 717.

"So, in the present case, Whitworth saw the necessity for immediate action, and pursued the only possible means of saving Potts. In Peyton v. Railway Co., 41 La. Ann. 864, 6 South. 690, 17 Am. St. Rep. 430, this court said: 'When one risks his life or places himself in a position of great danger in an effort to save another, or to protect another who is exposed to sudden peril or in danger of great bodily harm, it is held that such exposure and risk for such a purpose is not negligence. The law has such high regard for human life that it will not impute negligence to an effort to preserve it, unless made under such circumstances as to constitute rashness, in the judgment of prudent persons.' See, also, Eckert v. Railroad Co. (N. Y.) 3 Am. Rep. 721, and Thompson on Negligence, §§ 198, 199, for a strong presentation of the subject.

"That it is not rashness to voluntarily incur great danger to save another in peril was expressly decided by the Supreme Court of Ohio in Pa. Co. v. Langendorf, 48 Ohio St. 316-322, 28 N. E. 172, 13 L. R. A. 190, 29 Am. St. Rep. 553. This court expresses itself thus: 'There was but a fraction of a minute in which to resolve to act, or action would come too late. Under these circumstances, it would be unreasonable to require a deliberate judgment from one in a position to afford relief. To require one so situated to stop and weigh the danger to himself of an attempt to rescue another, and compare it with that overhanging the person to be rescued, would be, in effect, to deny the right of rescue altogether, if the danger was imminent.

" 'The attendant circumstances must be regarded. The alarm, the excitement, and confusion usually present on such occasions, the uncertainty as to the proper move to be made, the promptness required, and the liability as to mistake as to what is best to be done, suggest that much latitude of judgment should be allowed to those who are thus forced by the strongest dictates of humanity to decide and act in sudden emergencies. And the doctrine that one who, under these or similar circumstances, coming to the rescue of another, thereby encountering great danger to himself, is guilty of negligence per se, is neither supported by principle nor authority.'

"In another case (Eckert v. Long Island R. Co., the leading case on the subject) Grover, J., said: 'It was his duty to exercise his judgment as to whether he could possibly save the child without injury to himself. If, from appearances, he believed that he could, it was not negligence to make an attempt to do so, although believing that possibly he might fall and receive an injury to himself. He had no time for deliberation. He must act instantly if at all, and a moment's delay would have been fatal to the child.' 43 N. Y. 502, 3 Am. Rep. 721; Thompson on Negligence (2d Ed.) pp. 193, 194, 195. See, also, Gibney v. State (N. Y.) 33 N. E. 142, 19 L. R. A. 365, 33 Am. St. Rep. 690; San Antonio & A. P. Ry. Co. v. Gray (Tex. Sup.) 67 S. W. 763; Becker v. Railroad Co. (Ky.) 61 S. W. 997, 53 L. R. A. 267; 1 Sher. & Red. Neg. § 85.

"If latitude of judgment is allowed to the rescuer, although believing that he might fall and receive injury to himself, can a more proper instance be conceived, when Whitworth saw his friend and comrade meeting

an awful death by burning in midair, hanging head down?

"If anything is to be conceded to the excitement and commotion of the moment, can a case be conceived when such excitement could be more natural or irresistible? If decision of thought and quickness of action are ever demanded, when more so than in a case where Potts was entangled in live wires and being roasted to death? If an appeal to humanity is ever to be heeded, when could it be more imperative than on this awful occasion? But defendant's counsel say that Potts was already dead. We say that neither he nor any one else knows or could know that to be a fact.

"The degree of insulation would have much to do with that question, and could only be determined by a test. We feel that plaintiffs have as strong a case as can be well conceived. Here are all the elements to be found to warrant a judgment. The necessity for quick action, the doubt and uncertainty as to what is the best course, the tragedy of the situation of Potts—all these facts justified Whitworth in running even a great risk to save his friend. Under such circumstances the impulse to aid must have been well-nigh uncontrollable, and all the spectators testify as to the intensity of the excitement prevailing at the time. Whitworth's action must receive its color from the scene in which it is set. What is recklessness at one time may be common prudence when a calamity is impending, and no other resource is apparent. The awful consequences flowing from the gross carelessness and indifference of defendant company stand out in letters of iron. Whitworth's humanity was in striking contrast with its callousness in exposing others to deadly danger, and its cold-blooded plea in keeping with its conduct in weighing the cost of insulation, on the one hand, and the lives of men, on the other. There is nothing in the record to show that deceased knew that the wire was

a live one, nor that he intentionally took hold of the deadly instrument. From the evidence, we think it clear that it was his purpose to relieve his dying companion, whom he thought still lived, or he wanted to get the wires out of the street, or cut them and put them away, so that the crowd that was congregating could not come in contact with them. To show contributory negligence, the defendant must prove that he, knowing of the danger, voluntarily exposed himself to it. This it has not done. It has not been shown that he knew the wire he caught hold of was a deadly one, and, unless we assume that he intended to commit suicide, we must presume that he thought the wire harmless.

"It may be claimed that he should have known that his companion was dead, and it may be argued that the situation presented was past human aid. But that is not the criterion. He could not feel his companion's pulse, and listen to his heart beats, to ascertain if he still lived. The situation, to him, evidently held out the hope that by prompt action he could relieve the situation of his friend. He was not guilty of contributory negligence in acting on the appearances as they were presented to him. He was inexperienced, and therefore it is fair to assume he knew little of the dangerous agency with which he was dealing. He evidently thought the wire he attempted to cut would not harm him.

"The jury, who saw and heard the evidence, have rendered a reasonable verdict, and we ask that it be affirmed."

The only act of negligence which defendant charges against Whitworth is his going forward after the accident had happened to Potts, and taking hold of the live telephone wire which he had been using. Defendant's counsel insists that Potts was dead at the time Whitworth took hold of the wire, but we think he is mistaken as to that fact. At the time that Potts received the electric shock from the telephone wire, Holt was be-

low him on the same pole. On discovering what had happened, he went up the pole to where Potts was, to see whether he had by his fall become entangled in any way with any of the wires—intending, if such was the case, to cut them off—and, finding he was not, he went down and crossed the street to telephone to the office to obtain help. On coming out, he saw a policeman going up the pole. He himself returned to the pole with a hand line, went up the pole, and tied it around Potts and lowered him down. Reilly, a witness for the plaintiff, says he was right at Mr. Potts when he was drawing his last breath; that he was right across from where he was; that he heard some one hollering for help; he supposed it was Potts himself; that he was somewhat acquainted with him, and went up the pole where he was. He said he did not help to bring him down, but stayed by the pole until he was brought down by the rope that was put around him by the darky. The witness, being asked how long Mr. Potts lived after he saw him, answered: "Well, I suppose Mr. Potts was dead before I got off the pole. I think he must have been, for, after I got there, he drew a couple of gasps after I got down." Holt testified that upon leaving the house into which he had gone to telephone for help, and after he had returned to the telephone pole, he saw several persons carrying Whitworth off. Therefore Whitworth must have taken hold of the wire in the interval between Holt's leaving the pole after first coming down from it and his going up the pole a second time. Clanton, a witness for the defendant, testified that when he came on one of the Belt Line cars, opposite to the pole on which Potts had been working, he looked up and saw Potts hanging there; that he got off and started towards the pole, and when he got even with Whitworth, and about four feet from him, he hollered to him not to touch the wire, but he took hold of it, and it killed him; that he and his brother-in-law, Mr.

Price, went on and got a rope that the telephone men were using, and got Potts off the pole; that he saw Potts before any one had gone to him; that Mr. Price was the only one that went up the pole; that he saw Holt. He was going around trying to get some one to help him take Potts off the pole. Witness repeated "that as he got to the spot Whitworth came up to take hold of the wire, and that he told him not to do it, and he got hold of it, and it killed him."

In answer to a question he stated that Potts was already dead when he first looked at him. This witness was sincere in his statements as to the facts of the case, but his testimony does not accord with that of others. Price was not the first or only man that was on the telephone pole. Holt was upon it at the instant of the accident, and went up to where he was, and then went down, and went up the pole a second time. Holt says before he got back he saw a policeman going up the pole, and Reilly testified that he himself went up, and that Potts was still alive when he got to him; that is to say, he gasped several times after he reached him. Holt and Clanton say they told Whitworth not to touch the wire, but Holt did not tell him the result of the examination of the condition of things which he had found when he went up to where Potts was hanging. He did not tell him that he was then dead, nor did he tell him that he was then free from contact with the live wire, which contact had caused his death. He does not seem to have had any conversation with him as to Potts' condition at that time, and he himself was doubtless not aware of the extent of his injuries. Neither Holt nor Clanton, if they themselves knew the fact, told him of the force of the electricity with which the telephone wire was then charged. Holt, in his testimony, testified that a wire was often hot, and yet not sufficiently so to produce serious injury; that the strength of the current would depend upon the greater or less

extent of the leakage from defective insulation.

Whitmeyer saw Whitworth's actions throughout, and testified to the fact that they were evidently aimed at relieving Potts from the supposed danger of his situation.

## Opinion.

We have had twice before us cases where the plaintiffs in the case were injured in their attempt made to save others from imminent danger. The first case was that of Peyton v. The Texas Pacific R. R., 41 La. Ann. 861, 6 South. 690, 17 Am. St. Rep. 430; and the second, De Mahy v. Railroad, 45 La. Ann. 1329, 14 South. 61. In the second of these cases there was judgment in favor of the defendant under the special facts shown. The injury received was by a mother, who, with her little daughter, about two years old, had gone as a passenger upon a car operated by the defendant company upon its branch road between St. Martinsville and Cade Station. The latter place not being of sufficient importance in its business to justify the building of a passenger station, passengers going from St. Martinsville to Cade were in the habit of remaining in the coach until the train for which they were waiting should reach there. The schedule of the road was so made as to give the company an opportunity in this interval to attach to the coach any freight cars which might have been left at the station to be taken to St. Martinsville. The practice of the company was, upon the trains reaching Cade, to detach the locomotive, and by means of different switches to couple the cars onto the coach, which was left stationary on a track. This coupling necessarily gave, when made, some movement to the coach. On the day in question the coupling was made with no greater force than usual—a coupling from which no injury could or would have resulted under ordinary conditions. On that particular occasion, however, the mother of the child had incautiously permitted it to go several times upon the platform in front of the coach, although the conductor had warned the passengers to keep their seats. The child, not standing steadily upon its feet, was thrown forward by the force of the coupling into the space between it and the freight car just attached, and was in imminent danger of being crushed. The mother, who received herself no injury from the coupling, ran to the front door, down the steps, and, thrusting her arm under the coach, extricated the child, but at the expense of having her own arm badly broken and permanently injured. Her husband sued the company for damages, but judgment was rendered against him on two grounds. The first was that the company was not guilty itself of any negligence; that it had no reason to anticipate that a child of that age would be permitted to be upon the platform; and, second, because the mother, who was injured without fault on the part of the company, had brought her injuries upon herself by allowing the child to go upon the platform. The act on her part which barred the action was not her conduct in placing her arm under the moving car to save her child, but her antecedent act of allowing it to have gone upon the platform.

In the other case (that of Peyton v. The Texas Pacific R. R., 41 La. Ann. 861, 6 South. 690, 17 Am. St. Rep. 430) judgment was rendered in favor of the plaintiff. The defendant company in that case was adjudged guilty of negligence in running a train upon a thoroughfare of the city of Shreveport, in front of the Fair Grounds, where a large number of persons were congregated in and around its tracks, at a dangerous rate of speed, in charge of a fireman, instead of a regular, skilled engineer; and, by reason of this negligence, an inebriated man, standing on its tracks in front of the approaching car, with his back to it, was

about to be crushed, when a friend went to his rescue, and pulled him successfully off the track, but, in so doing, got struck and injured himself by the car. The defense of contributory negligence on the part of the plaintiff was not sustained. The court evidently considered that the plea of contributory negligence set up by a company which is itself at fault, is one which, though inuring to the company, does so by way of consequence or result, and is not one granted directly to the company in aid of any right which it has itself; that the plea in bar of an action is one which has grown up under jurisprudence, and not by any direct, positive law in aid of the general good and welfare, in furtherance of the two maxims, "Nul prendra avantage de son tort," and "Volenti non fit injuria," and, being the act of the court, is more or less subject to its control or modification in any given case, where, in its opinion, the public good and welfare are better to be subserved by not applying it, as where the thing done is not in fact to be considered a fault, but a meritorious act. The case at bar differs from the Peyton Case in this: that Peyton was injured by being advanced upon and struck by the car of the company while he was in or alongside the tracks of the company, running through a public thoroughfare, while in this case Whitworth himself advanced upon and took hold of the wire of his company (which he had been using), in its dangerous condition. In both cases, however, the defendant company was guilty of negligence. In the case of Corbin v. The City of Philadelphia, 195 Pa. 461, 45 Atl. 1070, 49 L. R. A. 715, 78 Am. St. Rep. 825, this question was very thoroughly considered. The case will be found reported in the forty-ninth volume of the Lawyers' Annotated Reports, accompanied by very copious and valuable notes and extracts taken from decisions of other states. In the case quoted, the city authorities of Philadel-

phia had caused a trench to be dug in one of the streets of that city, which became filled with a deadly gas, and which they had abandoned, leaving it without the necessary and proper safeguards to protect the passing public from falling in it. A child went into the trench to recover his ball, which rolled into it, and became overcome by the gas, whereupon a stranger went into the trench, and became himself overcome by the gas, and died. The child revived and escaped injury. The mother of the deceased brought suit against the city to recover damages for the death of her son, and judgment in favor of the defendant was rendered by the lower court, and reversed and remanded by the Supreme Court of Pennsylvania, to be submitted to the jury, three judges dissenting.

That case closely resembles the present one in its legal aspects. The Supreme Court, in the course of its opinion, said: "A rescuer—one who, from the most unselfish motives, prompted by the noblest impulses that can impel man to deeds of heroism, faces deadly peril—ought not to hear from the law words of condemnation of his bravery because he rushed into danger to snatch from it the life of a fellow creature imperiled by the negligence of another. He should rather listen to words of approval, unless regretfully withheld on account of the unmistakable evidence of his rashness and imprudence. This, conscience and reason approve, and the best judgment of thoughtful and intelligent judges has declared it to be the law of the land."

The court quoted approvingly from Eckert v. Long Island R. R. Co., 43 N. Y. 503, 3 Am. Rep. 721, which it declared was fairly regarded as the leading case upon the subject.

In the latter case the court said: "Negligence implies some act of omission or commission wrongful in itself. Under the circumstances in which defendant was placed, it was not wrongful in him to make every

effort in his power to rescue the child, compatible with a reasonable regard for his own safety. It was his duty to exercise his judgment as to whether he could save the child without serious damage to himself. If, from the appearances, he believed that he could, it was not negligence to make an attempt to do so, although believing that he might fail and receive injury to himself.

"He had no time for deliberation. He must act instantly, if at all, as a moment's delay would have been fatal to the child. The law has so high a regard for human life that it will not impute negligence to an effort to preserve it, unless made under such circumstances as to constitute rashness, in the judgment of prudent persons."

In the case at bar the jury evidently considered that Whitworth was not guilty of rashness in acting as he did. We ourselves think that he was not fully advised of the precise existing situation, and of the condition of Potts as he then was, hanging upon the pole; that he was not advised as to the precise danger he was himself incurring when he took hold of the wire; and that, even if he heard the warning to him of Holt and Clanton not to touch the wire, he did not know the grounds upon which that warning was based. He may well have conceived that the advice was being given to himself to act from selfish motives, and from the selfish side of his nature, and to take no risks whatever in the premises—advice which his own sense of duty and regard for the safety of others led him not to follow. We certainly cannot impute to him an intention to commit suicide. We do not think we are called upon in this case to go back of the conclusions of fact reached by the jury.

For the reasons herein assigned, the judgment appealed from should be, and it is hereby, affirmed, at costs of appellant.

LAND, J., recused, having presided in the court below.

On Rehearing.

(April 11, 1904.)

PROVOSTY, J. On further consideration, the amount of the judgment in this case is reduced to $5,000, and, as thus amended, the decree heretofore handed down is adhered to, and a rehearing is refused.