BRACEY ET AL., APPELLANTS, *v.* NORTHWESTERN IM-PROVEMENT CO. ET AL., RESPONDENTS.

(No. 2,830.)

(Submitted May 23, 1910. Decided June 6, 1910.)

[109 Pac. 706.]

*Personal Injuries — Negligence — Rescuing Person in Danger— Recovery Proper, When—Variance—Failure of Proof.*

Personal Injuries—Rescuing Person in Danger—Recovery Proper, When.

    1. One who, observing another in peril, voluntarily exposes himself to the same danger to save the latter's life, may recover for any injury sustained in effecting the rescue, from the person by whose negligence the peril was brought about, provided the exposure is not made under such circumstances as to constitute rashness in the judgment of prudent persons.

Same—Variance—Failure of Proof—Nonsuit.

    2. The complaint in an action to recover damages for the death of a coal miner who, while attempting to rescue a fellow-workman, was himself overcome by poisonous gases and died from the effect of their inhalation, charged that the death of decedent was due to the accumulation of gases spontaneously generated in unused workings entered by him; the evidence disclosed that the gases from the inhalation of which deceased died were generated by a fire in the mine. *Held*, that there thus appeared between the cause of action alleged and the evidence adduced to establish it such a variance as amounted to a failure of proof, and that a motion for nonsuit was properly granted.

Same—Evidence—Causal Connection.

    3. In personal injury cases the evidence must tend not only to show the negligence alleged, but also the causal connection between it and the injury.

*Appeal from District Court, Carbon County; Frank Henry, Judge.*

Action by Ernest Bracey and others, by Alice Bracey, their guardian, and by herself in her own right, against the Northwestern Improvement Company and another.   From a judgment for defendants, plaintiffs appeal.   Affirmed.

*Messrs. Walsh & Nolan,* and *Messrs. Meyer & Wiggenhorn* submitted a brief in behalf of Appellants.   *Mr. C. B. Nolan* argued the cause orally.

The principal question presented by the appeal is whether or not the defendant company owed any duty to Bracey, as a rescuer, other than to refrain from wantonly inflicting injury upon him, and this necessarily presents for consideration the duty, if any, which the defendant company owed to Bracey as a volunteer rescuer.   We submit that the company, in failing to prevent an entrance into the mine to those engaged in the work of rescue, and without advising as to its death-dealing characteristic, was guilty of the grossest negligence.   The principle here invoked has been repeatedly approved by the courts in connection with rescues effected against approaching trains.   (See *Pennsylvania Co.* v. *Lengendorf,* 48 Ohio St. 316, 29 Am. St. Rep. 553, 28 N. E. 172, 13 L. R. A. 190; *Corbin* v. *Philadelphia,* 195 Pa. 461, 78 Am. St. Rep. 825, 45 Atl. 1070, 49 L. R. A. 715; *Gibney, Admx.,* v. *State,* 137 N. Y. 1, 33 Am. St. Rep. 690, 33 N. E. 142, 19 L. R. A. 365; *Maryland Steel Co.* v. *Marney,* 88 Md. 482, 71 Am. St. Rep. 441, 42 Atl. 60, 42 L. R. A. 842; *Whitworth* v. *Shreveport Belt R. Co.,* 112 La. 363, 36 South. 414, 65 L. R. A. 129; *Henry* v. *Cleveland, C., C. & St. L. Co.,* 67 Fed. 426.)

The cases generally hold that where a volunteer is injured, before a recovery can be sustained it is necessary to show negligent conduct toward the rescued or the rescuer.   Indeed, to authorize a recovery, no negligence whatever need be established toward the rescuer.   If the rescued was placed in a perilous position, the rescuer might take the place of the rescued, and assert such rights as the person rescued might be able to assert.

(See *Saylor* v. *Parsons,* 122 Iowa, 679, 101 Am. St. Rep. 283, 98 N. W. 501, 64 L. R. A. 542; *Donahoe* v. *Wabash, St. L. & Pac. Ry. Co.,* 83 Mo. 560, 53 Am. Rep. 594.)

Some courts hold that it is only in the case of an effort to save life that the volunteer is protected to the extent which the cases referred to declare. (See *Eckert* v. *Long Island R. R. Co.,* 43 N. Y. 502, 3 Am. Rep. 721.)

In behalf of Respondents, *Mr. William Wallace, Jr., Mr. John G. Brown,* and *Mr. R. F. Gaines* submitted a brief. *Mr. Gaines* argued the cause orally.

Counsel insist that the rule of law applicable to this case is that where human life is involved, the rescuer is put in the place of the rescued; and, if toward the rescued the employer is derelict, the rescuer may invoke the advantage of such dereliction. This statement, on its face, apparently disregards the necessity for the existence of a duty owing to the rescuer, from the person sought to be held accountable. If this be in fact a rule of law, it must by all be conceded that it is a radical departure from the fundamental principle giving rise to a tort action, *viz.,* a duty owing, and that duty breached. And we feel, therefore, that being confronted with the alternative either of announcing such a rule, or of limiting its seeming effect to cases in which a duty actually was owing toward the rescuer, every court should unhesitatingly incline toward the latter view. As a matter of fact, as we read the cases relied on by appellants, the courts have done just this. For example: In the case of *Pennsylvania Co.* v. *Langendorf,* the negligence of the railroad company consisted in having no watchman at the crossing and in running its train at an unlawful rate of speed. In *Eckert* v. *Long Island Ry. Co.,* the court took the view that the railroad company was guilty of negligence in the operation of the train at a high rate of speed in a populous neighborhood and without signals, thus violating a duty it owed to the public generally. The same reason for permitting a recovery (irrespective of the feature of contributory negligence) is present in each of these cases, *viz.,* a

duty owing to the public and including the injured person. These two cases are quoted approvingly in *Corbin* v. *Philadelphia,* 195 Pa. 461, 78 Am. St. Rep. 825, 45 Atl. 1070, 49 L. R. A. 715; and in that action it was a duty owing to the public that had been breached, and a foundation thus furnished for a recovery.

MR. CHIEF JUSTICE BRANTLY delivered the opinion of the court.

This action was brought by Alice Bracey in her own right, as the widow and heir of J. E. Bracey, deceased, and as guardian of her minor children, for damages for the death of said Bracey, which it is alleged was caused by the negligence of defendants. The death of Bracey was caused by the inhalation of poisonous gases during an attempt by him to rescue miners in the employ of the defendant company, in its coal mine at Red Lodge, in Carbon county, who had themselves been overcome by inhaling such gases while engaged in an effort to extinguish fire then burning in the mine.

The complaint is very long and somewhat indefinite in some of its allegations; but these may be epitomized as follows: The defendant Pettigrew was the superintendent and general manager of the defendant company and had full charge of its business operations. On and prior to June 7, 1906, there were in the mine gases, deadly and explosive. In order to expel them, the defendant company resorted to ventilation by means of electric fans, which drove currents of air into and through the passageways and out through other openings, thus expelling the gases, or, by reverse movement, drew them out by currents produced by suction, thus allowing fresh air to be forced in through other openings. In some of the passageways there were obstructions, created by debris which was permitted to accumulate therein from falls of rock and earth. These obstructed the free passage of air currents. There were unused workings, from which the coal had been extracted. In these, gases accumulated from time to time, and, escaping therefrom when the fans were

not in operation, accumulated in the passageways. On and prior to June 7 a fire had for some days been burning in the mine. On June 6 one of the ventilating fans had been stopped, and for this reason gases accumulated in the passageways through which men going in to subdue the fire must pass. This fan was started on the morning of the 7th, but had not been running a sufficient time to clear the passageways of the gases. The defendants did not examine these to ascertain their condition. Several miners were sent in by the direction of defendant Pettigrew to subdue the fire, without being informed, however, of the presence of these gases, and, being overcome by them, were in peril of their lives. Information of this condition was brought to the knowledge of defendants and was circulated in the vicinity of the mine, and the defendants knew that rescue parties were likely to go in to effect a rescue. The deceased, Bracey, did not know of the conditions prevailing. At the request of the defendants, and by reason of the information gained through persons in the vicinity, Bracey entered the mine to aid in the rescue. After stating these facts, the complaint proceeds: ''That the defendants, wholly disregardful of their duty in the premises, negligently failed to inform and advise the said J. E. Bracey, so entering said mine in the manner hereinabove set forth and under the circumstances therein stated, and for the purpose specified, as to the existence of the poisonous gases that had accumulated in said mine and the workings thereof, and that were then existing through the negligent acts and conduct of the defendants, as above set forth, and negligently failed to advise the said J. E. Bracey of the lack of ventilation then and there existing as above set forth; and the said J. E. Bracey, then and there ignorant of the lack of ventilation, and then and there suspecting and believing that the only dangers and risks to which he was then exposing himself in the work of rescue, aforesaid, were the dangers and risks which arose from the gases then being created and existing on account of the prevalence of the fire in said mine, hereinbefore referred to, on the date named entered said mine and the workings thereof for the purpose of rescuing

the said named persons therein, and the said J. E. Bracey so entering said mine and the portions thereof where said work of rescue was to be performed by him, as aforesaid, and so engaged in said work, was overcome by the gases so negligently permitted to accumulate, as aforesaid, in consequence of which, on the day named, he died in said mines; and plaintiffs further aver, in that connection, that the gases then and there causing his death were gases other than those generated and developed by said fire and of whose existence he was then and there conscious.''

The answer denies all of the allegations of the complaint charging the defendants with the acts and omissions constituting the negligence alleged. It alleges that the deceased entered the mine as a volunteer, and that his death was due to his own contributing fault and negligence. At the close of plaintiff's evidence, the defendants moved the court to direct a verdict in their favor, on several grounds, among others, in substance, the following: For that while it is alleged in the complaint that the death of Bracey was due to the inhalation of gases other than those generated by the fire, of which he had knowledge, the evidence shows conclusively that it was caused by gases generated directly by the fire. The motion was sustained, and judgment entered accordingly. The appeal is from the judgment.

The only question submitted for decision is whether the trial court properly withdrew the case from the jury. Recovery is sought upon the theory that the defendants are chargeable with the death of Bracey, by requesting or permitting him to enter the mine for the purpose of rescuing the imperiled miners, without informing him of the dangerous conditions known or which should have been known to them to exist therein, and thus exposing him to a peril of which he had no knowledge. It will be noticed that the existence of the fire is not attributed to any negligence or omission of duty by the defendants; nor is it alleged that gases generated by it were permitted to accumulate. It is alleged that the peril of the miners was due to the accumulation of gases spontaneously generated in the unused workings,

and that the accumulation of these in the passageways which·
he entered was the cause of Bracey's death. Plaintiff's right
of recovery must, therefore, be sustained or denied upon the·
showing made by the evidence on this point.

The rule is recognized generally that one who, observing an--
other in peril, voluntarily exposes himself to the same danger·
in order to protect him or save his life, may recover for any in-
jury sustained in effecting the rescue, against the person through·
whose negligence the perilous condition has been brought about,
provided the exposure is not made under such circumstances as·
to constitute rashness in the judgment of prudent persons. In
Mr. Thompson's work on Negligence, we find the rule stated as·
follows: "One who, acting with reasonable prudence, voluntarily
exposes himself to danger for the purpose of protecting the per--
son of another, may recover for the consequent injuries which
he receives, from the persons whose negligence or other wrong·
caused the injury to himself and the danger to the person whom·
he sought to rescue." (Section 199.) The rule rests upon the·
principle that it is commendable to save life, and, though a per-
son attempting to save it voluntarily exposes himself to danger,.
the law will not readily impute to him responsibility for an in-
jury received while doing so. In such cases the incurring of·
the danger is not *per se* negligence, and the question whether·
there was contributory negligence is ordinarily to be answered
by the jury upon proof of the circumstances surrounding the·
attempt to rescue—such as the alarm, excitement, and confusion
usually present, and the uncertainty as to the means to be em-
ployed, the promptness required, and the liability to err in the·
exercise of judgment as to the best course to pursue—and great·
latitude of judgment must be allowed to one who is impelled
by the dictates of humanity to decide and act in the face of·
emergencies. This is true in a case where an effort is made to·
rescue a person discovered upon the track in front of a rapidly
moving train. (*Pennsylvania Co.* v. *Langendorf*, 48 Ohio St..
316, 29 Am. St. Rep. 553, 28 N. E. 172, 13 L. R. A. 190.) In·
this case the plaintiff was injured while attempting to rescue·

a child which he discovered in front of a train approaching at
an unlawful rate of speed, at a public crossing which had been
left unguarded by the defendant company. The court said:
"The act of the defendant in error was not only lawful, but it
was highly commendable; nor was he in any legal sense respon-
sible for the emergency that called for such prompt decision and
rapid execution. The negligence of the railroad company in
having no watchman at this public crossing and the unlawful
rate of speed at which the train was running toward it, to which
may, perhaps, be added that of the nurse in charge of the child,
were the causes of its extreme danger. There was but the frac-
tion of a minute in which to resolve and act, or action would
come too late. Under these circumstances, it would be unrea-
sonable to require a deliberate judgment from one in a position
to afford relief. To require one so situated to stop and weigh
the danger to himself of an attempt to rescue another, and com-
pare it with that overhanging the person to be rescued, would
be in effect to deny the right of rescue altogether, if the danger
was imminent. The attendant circumstances must be regarded.
The alarm, the excitement, and confusion usually present on such
occasions; the uncertainty as to the proper move to be made;
the promptness required; and the liability to mistake as to what
is best to be done—suggest that much latitude of judgment
should be allowed to those who are thus forced by the strongest
dictates of humanity to decide and act in sudden emergencies.
And the doctrine that one who, under those or similar circum-
stances, springs to the rescue of another, thereby encountering
even great danger to himself, is guilty of negligence *per se,* is
supported by neither principle nor authority."

*Eckert* v. *Long Island R. Co.,* 43 N. Y. 502, 3 Am. Rep. 721,
was a similar case, and in declaring the rule of law applicable
the court said: "Under the circumstances in which the deceased
was placed, it was not wrongful in him to make every effort in
his power to rescue the child, compatible with a reasonable re-
gard for his own safety. It was his duty to exercise his judg-
ment as to whether he could probably save the child without

serious injury to himself. If, from the appearances, he believed
that he could, it was not negligence to make an attempt to do
so, although believing that possibly he might fail and receive an
injury himself. He had no time for deliberation. He must act
instantly, if at all, as a moment's delay would have been fatal
to the child. The law has so high a regard for human life that
it will not impute negligence to an effort to preserve it, unless
made under such circumstances as to constitute rashness in the
judgment of prudent persons.'' (See, also, *Becker* v. *Louisville
& Nashville R. R. Co.*, 110 Ky. 474, 96 Am. St. Rep. 459, 61 S.
W. 997, 53 L. R. A. 267; *Donahoe* v. *Wabash, St. L. & Pac. R.
Co.*, 83 Mo. 560, 53 Am. Rep. 594; *Linnehan* v. *Sampson*, 126
Mass. 506, 30 Am. Rep. 692; *Whitworth* v. *Shreveport Belt Ry.
Co.*, 112 La. 363, 36 South. 414, 65 L. R. A. 129; *Corbin* v. *Phila-
delphia*, 195 Pa. 461, 78 Am. St. Rep. 825, 45 Atl. 1070, 49 L.
R. A. 715; *Maryland Steel Co.* v. *Marney*, 88 Md. 482, 71 Am.
St. Rep. 441, 42 Atl. 60, 42 L. R. A. 842; *Saylor* v. *Parsons*, 122
Iowa, 679, 101 Am. St. Rep. 283, 98 N. W. 500, 64 L. R. A. 542;
*Gibney, Admx.*, v. *State*, 137 N. Y. 1, 33 Am. St. Rep. 690, 33
N. E. 142, 19 L. R. A. 365; Wharton's Law of Negligence, sec.
314.)

In *Corbin* v. *Philadelphia, supra*, the defendant had left in
one of its streets an excavation, made in an endeavor to find an
old sewer. The work had been abandoned because gas had ac-
cumulated in the excavation in such quantity as to make it un-
safe to continue it. It was near a vacant lot, where boys were
in the habit of playing ball. No warning had been given that
there was gas in it. A few days after it was abandoned, a ball
was knocked into it, and a boy went to get it. He was overcome
by gas and fell to the bottom. Plaintiff's son, observing his
condition, went to his rescue and was himself overcome and died.
The supreme court held that it was a question for the jury
whether the city had been guilty of negligence, and also whether
the deceased was justified in attempting the rescue.

In all cases, negligence toward the person rescued or the per-
son making the rescue, after the attempt has begun, is essential

to recovery.    (*Saylor* v. *Parsons, Donahoe* v. *Wabash, St. L. & Pac. Ry. Co., supra.*)    Nevertheless, the presumption that the rescuer is impelled by the dictates of humanity is of itself sufficient to send the case to the jury, unless it is apparent that, when he encountered the danger, he ought, as a prudent person under the same circumstances, to have known that he could not escape injury or death.    The same presumption applies in an action upon an accident insurance policy which contains a stipulation against liability for injuries resulting to the insured from voluntary exposure to unnecessary danger.    (*Da Rin, Admr.,* v. *Casualty Co. of America, ante,* p. 175, 108 Pac. 649.)

As has already been said, the charge is that the defendants negligently exposed Bracey to a danger of which he had no knowledge, to-wit, permitted or requested him to go to the rescue thinking that the miners had been overcome by gases generated by the fire, and that he would expose himself to the danger of encountering these only; whereas they knew, or should have known, that he would on his way to them encounter peril from the spontaneous gases which had accumulated in the passageways from the abandoned workings.    The inquiry here, therefore, is not whether the defendants were guilty in exposing the deceased to this danger, within the rule declared by the authorities cited, but whether the cause of his death was that alleged; that is, "gases other than those generated and developed by the fire and of the existence of which he was then and there conscious."    It may be conceded that they were guilty of gross negligence, both in sending the miners in to subdue the fire without ascertaining what the conditions were, and afterward in permitting the rescuers to enter in ignorance of them.

It is somewhat difficult to ascertain from the statements of the witnesses a clear understanding of the relations to each other of the various portions of the mine, and the method adopted to secure ventilation.    As we understand the situation, the deposits of coal consist of several superimposed and nearly parallel veins descending into the earth from the outcrop on the side of a hill, at an angle of from sixteen to eighteen degrees.    They vary in

thickness from five to fourteen feet, and are separated by strata of country rock varying from fifty to one hundred feet in thickness. They·are mined through slopes driven into the hill, following the incline. From the slopes, at convenient distances, usually five hundred feet, and in a direction perpendicular to them, levels are driven in order to open up the bodies of the deposits. From the levels, and parallel with the direction of the slopes, are excavations called "rooms." The slopes consist of parallel entries, separated by a wall of coal; one being used for the purpose of hauling out coal and the other as an air passage. The slopes and levels are so connected by openings, either through the country rock or the intervening coal deposits, as to allow free passage of air currents. These are produced by a system of reversible .fans which send the currents inward. or outward, at the will of the operator, and are so adjusted in the direction of their revolution as to assist each other in maintaining a constant current, and keep the portion of the mine in which work is in progress free from gases. The veins are numbered from 1 to 6, beginning with the uppermost. At the time of the accident, fire had been burning for some days in two different rooms, one on one of the levels connected with the slope on vein No. 6, and one on level 4 on vein 4. The most convenient way of access to the point where the first was, was through slope No. 6. This portion of the workings was ventilated by one fan, known as "No. 6," on slope 6, assisted by another, designated as "No. 2," at the entrance to slope No. 2, between which and slope 6 there were open air passages. On the morning of the accident, work having been suspended because of the fire, a number of men were sent into the mine to subdue the one burning on slope 6. A short time afterward news was brought to the office of the company by some of them who had returned, that the others had been overcome by gas and would die unless they were rescued at once. The news was also circulated in the town of Red Lodge. Employees of the company not on duty, of whom deceased was one, and relatives of some of the imperiled miners, gathered at the company's office with the employees who

had returned, and, having obtained lights, went immediately to the rescue. It does not appear that any of these were requested to go, but rather that all went willingly, the impulse governing them being the desire to save the men, if possible. The defend-ant Pettigrew joined with the rest, some dozen in all. The de-ceased was in company with the witnesses Freeman and Ather-ton, two other of the company's employees. When they reached the men, who were near the bottom of slope No. 6, Bracey was so affected by the gas that he was entirely overcome and died before help could reach him. Atherton and Freeman were both helped out by the others. Six of the men sent in to subdue the fire lost their lives.

The evidence is silent as to what inspection had been made by the company to ascertain the conditions before the miners were sent in to subdue the fire, or as to whether any information con-cerning them had been given to any of the rescuers. It tends strongly to rebut the conclusion, however, that the deceased died from inhaling gases other than those generated by the fire. On this point Atherton testified: "I don't know just where the gas accumulated from; whether it came from No. 2 entry that we was looking at, or any of these rooms cut through there. It might have come out of them, but I don't know. It came from the fire, I believe; but which way it came I don't know." Mc-Kenzie, another of the rescuers who was overcome and had to be helped out, testified: "The gases which were in the mine at the time I entered, at about 10 o'clock in the forenoon (the time of the rescue), were occasioned by a fire down in the third west entry, and the air, being forced from there out past the place where I was, carried the gas with it." This is all the evi-dence on the subject to be found in the record. The circum-stances also tend strongly to show that the conclusion of these witnesses is the correct one, for it appears that the miners en-gaged on the day before in an attempt to subdue the fire had experienced no inconvenience from the presence of gas, and that the accumulations which occasioned the loss of life were due, either to the stopping of the fans during the preceding night,

or to the inefficient operation of them during the morning prior to the time work was commenced. Indeed, there is no foundation in the evidence for the inference that gases in dangerous quantities were spontaneously generated in the abandoned workings.

The plaintiff having alleged in her complaint that Bracey's death was due to the inhalation of gases other than those generated by the fire, and having failed to furnish evidence to establish, directly or indirectly, the specific cause of it thus alleged, the motion for nonsuit was properly granted. The divergence thus appearing between the cause alleged and the evidence adduced to establish it is such a variance that it amounts to a failure of proof, and brings the case within the rule that, unless the evidence furnishes substantial support for the cause of action alleged, the plaintiff has failed to make out his case, even though the evidence shows negligence in other respects. (*Forsell* v. *Pittsburgh & Mont. Co.,* 38 Mont. 403, 100 Pac. 218; *Flaherty* v. *Butte El. St. Ry. Co.,* 40 Mont. 454, 107 Pac. 416.) The evidence must tend not only to show the negligence alleged, but also the causal connection between it and the injury. (*Monson* v. *La France Copper Co.,* 39 Mont. 50, 101 Pac. 243.)

The judgment is affirmed.

*Affirmed.*

Mr. Justice Smith and Mr. Justice Holloway concur.