Statement of the JJase.
MONROE, J.
Plaintiff sues in her own behalf and in behalf of. her minor child, issue of her marriage with her deceased husband, for damages for injuries to the latter, resulting in his death, which injuries she alleges were caused by the negligence of the defendant. The answer is a general denial, coupled with a plea of contributory negligence.
The facts, as we find them, are as follows: The decedent had been enjployed by the Cumberland Telephone & Telegraph Company, at Memphis; had then gone into some other business; had returned to the telephone company, and had been employed.by it for about two years at Covington, from which place, about two months before the accident out of which the suit has arisen, he had been transferred to New Orleans. At the time of the accident he was discharging the functions of “trouble man,” and on the morning of March 16, 1907, he went to the corner of Chestnut and Peniston streets to remedy a trouble which he appears to have located at that point. The wires of the telephone company were strung near the top of a creosoted or carbolineum pole, which stood upon the lower, lake-side, corner, and upon the same pole, some 15 or 16 feet lower down, and about 30 feet from the ground; were 3 cross-arms, upon which were strung the wires of the Railway & Light Company, defendant herein, the telephone wires' running along and in the direction of, Chestnut street, and those of the Railway & Light Company running at a right angle with them along Peniston street. The currents of electricity carried by the wires of the defendant meant certain death to any one who touched a wire not properly insulated, and there were 6 such wires upon the cross-arms mentioned; one, upon the upper cross-arm, which supplied the street lights of the city, and from which at the time of the accident the current was probably shut off; two, called “primary” wires (carrying 2,300 volts), upon the. next cross-arm, 18 inches below; and three, called “sec *947 ondary” wires, upon the third arm, which was 18 inches below the one last mentioned. The cross-arms were, say, 8 feet long, and the primary wires were strung on either side of, and about 3 feet from, the pole. Of the three secondary wires, two were strung on one side of the pole, the nearest, about 2 feet distant, and the other, about 3 feet, and the third wire was strung upon the other side of, and 3 feet distant from, the pole. In order to reach the telephone wires, therefore, for the purpose of making repairs or other purpose, it was necessary that the workman should ascend between the power and light wires and the pole, and, where a new wire was needed (for the telephone service), it was necessary that, whilst, himself, so ascending, he should pass such new wire around upon the outside of the power and light wires. Moren appears to have reached the scene about 8 o’clock in the morning and to have spent some time in investigation, during which he ascended the pole to the place where the telephone wires were strung. He then concluded that he needed assistance, and about 10 o’clock went to a residence in the neighborhood, and telephoned the main office of his company to that effect, and the man who received the message, and whose duty it was to attend to such matters, answered, telling him to “let the line go” until 1 o’clock, at which hour a helper would be sent to him. He, however, appears to have •decided that, rather than wait, he would endeavor to go on with the job by himself, and shortly after he had sent the message he climbed the pole, carrying with him the end of a wire which came from a reel that was lying on the Chestnut street banquette, some 20 or 30 feet away, and he reached the cross-arms upon which defendant’s wires were strung, and, whilst there, received a shock, and the next that was seen of him he was holding on to, and at the same time trying to fight himself loose from, one of the 2,300 volt wires on the middle cross-arm. The only witness who saw him at that moment was Mrs. Landry, who lived in one side of the double tenement in front of which the pole in question was situated, and she described what she saw as follows:
“While I was on my gallery, I was attracted by a peculiar noise¡ and I turned around and saw this man on the pole, and he seemed to have been holding his wires, or something, and sparks came out of his hands, and the man fought himself away from those wires and simply fell, and, when he struck the ground, he grunted, and that is all. * * * Q. What kind of a noise? A. It was just going as if something was frying.”
The attention of William Dodge was attracted by a boy, who said, “Just look at that man falling,” and Dodge looked, barely in time to see the body of Moren strike the wooden crossing over the gutter. He did not see the beginning of the fall, nor, did he go near the injured man after he fell. Moren was moved from the wooden crossing upon which he fell into Mrs. Landry’s yard, but by whom the record does not show. Mrs. Behrens and Mrs. Govan, who live quite near, found him in the yard, and he told Mrs. Behrens that he fell because “he had to let go; that he was burning up.” Dodge did not know whether he had gloves on or not, and neither of the ladies mentioned saw any gloves when they reached him, in the yard. They did not look about the place where he had fallen. A negro gardener, who was at work in Mrs. Behrens’ yard, upon the corner diagonally opposite to that upon which the accident happened, testifies that Moren ascended to, and fell from, the top of the pole, and, catching on the power and light wires, fell from there to the ground. He thinks he had on gloves. Moren was taken, in the hospital ambulance (after being afforded some relief by the student in charge), to his home, and was thereafter treated by Dr, Dabney, who says:
“He suffered excruciatingly. * * * His suffering was constant * * * until he died. *949 except in brief intervals when he was under pain-alleviating drugs.”
The doctor also says that he died of lockjaw on June 22d. E. L. Powell, division superintendent, and Loyd Dietz, chief city wire-man, of the telephone company, called on Moren on the day of the accident, and they testify that he said that he, and not the “trouble man” at the office, was to blame. Powell’s testimony reads, in part as follows:
“He said that he went up there to put a broken line in, and that, when he first arrived at the scene of the break, he thought it was a dangerous thing to attempt to put up the wire by himself; that he called up the trouble department of the telephone company, and, in talking to the young man in charge of the trouble desk, he explained just the condition, and told him that he was afraid to put up the wire by himself. The young man in charge instructed him not to put up the wire; that he would send a' man up there to help him, * ^ * * about 1 o’clock. He says, ‘You just get it out of danger.’ Mr. Moren told me that, after waiting a few minutes, being in a hurry, as he had other work, he decided that he could put the wire up himself, and he undertook to do so; and, in attempting to pass the telephone wire over the electric wire, his arm got too close to the electric light wire and it seemed to be drawn to the electric wire, he didn’t know how, but that the whole thing occurred in a very short space of time, just as he was raising the wire over, and he received a shock and a burn. I asked him if he thought anybody was at fault in the matter, at all, and he said, no, he did not blame anybody. He said: T ought to have known better than to have attempted -to put that wire up myself;’ and he said that the trouble chief * * * told him not to try it. Q. What appliances does the telephone company require its men to have in doing this kind of work? A. When putting up broken wires, and particularly, when putting them up in a dangerous locality, the men are required to use a hand line, a rope; instead of attempting to draw the wire over, they pass the rope over from a safe position, and pull it out of the way. They are also required to have rubber gloves. Q. Did Mr. Moren tell you whether he used any one of these appliances? A. I didn’t ask him and he didn’t tell me. * * * The immediate cause of the accident was undoubtedly, in my mind, coming in contact — that is, the telephone wire that he held in his hand — with the electric wire, or it came in contact with his arm or hand. * * * Q. Your company owns that pole? A. Yes, sir. * * * Q. Therefore your company had to give permission to the Electric Light Oompany to string its wires on it? A. Yes, sir; there was an agreement, either with the New Orleans Railway Company or with the Edison Company. I think the agreement is an old one with the Edison Company. * * * Moren was quite a reliable, honest, sober, and industrious man,” and he was regular in his work.
Dietz, after testifying that he had been for 12 years in the employ of the telephone company, that he had instructed Moren as to the danger of passing through electric wires, that he had himself “many times” climbed upon the pole upon which the accident happened, and that there was room enough, between it and the power and light wires, for him to pass in safety, was cross-examined by plaintiff’s counsel (he and the other employes of the telephone company having been called as witnesses for defendant), as follows:
“Q. What is the object of insulation on these dangerously charged electric wires? A. I can’t say. Q. You don’t know why electric wires are insulated? A. No, sir. Q. And you are the chief city wireman of the Cumberland Company, situated in New Orleans? A. I can’t say why they insulate them. Q. And you make that admission? A. Yes, sir. Q. And you testify that you are absolutely ignorant? A. I know, but X don’t see any reason. Q. You don’t see any reason for carrying a current severe enough to kill a man? By Mr. ICernan (counsel for defendant): Q. You stated you didn’t see why they insulated the wires; tell us why ? A. Well, that is the reason, I don’t know; but from my own standpoint, it is because I treat all electric wires as not insulated, and that would be a chance for everybody to protect themselves. When I see an electric light wire I treat as a bare wire.”
Mrs. Moren testified, in part, as follows:
“From the time my husband was brought- home, in a helpless condition, until lockjaw set in, which prevented his talking, he told me, at different times, how the accident occurred. * * * The accident was caused by his ascending the pole, about 25 or 30 feet, with the wire of the Cumberland Telephone & Telegraph Company in his hand, and in passing that wire over and through the New Orleans Railway & Light Company’s wires, which he was compelled to do; * * * there was a contact with a worn wire of the defendant company, and the shock was so great that Mr. Moren was drawn on the insulated wires; his left hand and fingers were burned to a crisp. He jumped to free himself from the improperly insulated wires, and fell to the ground, and the bones of his left wrist were broken and the thumb of his right hand was dislocated at the first joint. His spine was injured in the fall, and he suffered untold ag *951 onies every minute. He was hurt internally. The jump was made to save himself from being burned to death. When brought home, he was helpless and was never, afterwards, able to turn over in bed. He had to be turned over every 30 minutes, both day and night, and I was by his side almost all the time. * * * About Wednesday, after the accident” (which seems to have happened on Saturday), “an agent of the defendant company came to see Mr. Moren and to take a statement from him. In answering the Questions of the agent, Mr. Moren was weak and indistinct, and the agent asked him the direct question: ‘You don’t claim that it was our wires that caused your injuries, do you?’ Mr. Moren replied, ‘Yes; I do say it was the improper insulation of your wires which •caused me to be in this fix.’ ”
On the day after the accident, Jules Meyer, the assistant to defendant’s general foreman, made an inspection of the pole and wires in question, and, speaking of the wires he says:
“Well, the wires were all right — a little weather-beaten. I saw a little spot where the man got burned, and that is the only place where I could see any wrong. Q. On what wire was that? A. On the second arm; on the primary. By the Court: You mean that wire carrying 2,300 volts? A. Yes, sir. By Counsel: * * * Q. What sort of wires are the electric light wires considered to be; * * * I mean in respect to their safety or danger? A. They are all insulated, of course, with the regular insulation we have all over the city. Q. Take one of these 2,300 volt wires, how do you look upon it when you handle it? A. We handle it with rubber gloves. Q. And, in taking something over it, to hang it higher up, what is the proper way to proceed to do it? A. You have to take a rope and tie your wire on it and get it to the height, then, swing it over, but the proper .way is to throw the rope over it and get in such a position that you can clear your wires without touching anything else. If you come in contact with the electric wires, you have no show at all with them, and especially on a carbolineum pole.”
The cross-examination of the witness proceeded, in part, as follows:
“Q. And you discovered on the 2,300 volt wire a defective spot, in the insulation, where this man was burned? A. Yes, sir; I saw a little of the skin of his hand on it. Q. Skin from the palm of his hand? A. Yes, sir; it was sticking to the wire. Q. You also stated something with regard to the creosoted pole, or carbolineum pole, that'was on the cornel", and you gave your understanding, or belief, that the fact that the pole was creosoted made it — what? A. Made it more dangerous. Q. Was it more dangerous than a wooden pole? A. Why, yes, it was like iron. * * * Q. And all the officers in charge of your corporation know that? A. Yes, sir.”
The witness further testifies that the telephone company had a wire running down, the pole, into the ground, to protect its system from lightning. And he was asked:
“Did that have any bearing on the accident?”
To which he answered:
“It was against the pole.”
He was then asked:
“The pole was a good conductor, and, besides, it had this wire *on it?”
And he replied:
“Yes, sir.”
Wm. Murphy, defendant’s general foreman, visited the scene on the day of and after the accident, and climbed the pole. Being asked what he found he said:
“Some few small, little, places on the 2,300 volt wire, underneath which was covered on top like a little finger mark.”(?)
City ordinance No. 13,970, Council Series (adopted February 1, 1898), contains, among others, the following provisions:
“Electric Light and Power Wires.
“aa. Electric light and power conductors shall be secured to insulating fastenings, covered with an insulation which is waterproof and not easily abraded. Whenever the insulation becomes impaired it shall be renewed immediately.“bb. In the construction of lines, the insulation to be used shall be approved by the city electrician, in writing.
“General.
# si?
“Sec. 2. All * * * corporations violating arw of the provisions of this ordinance shall, on conviction, * * * be fined,” etc.
A. L. Black, defendant’s engineer, testifies that 'he did not recall submitting the wires (referring to the insulation) to the city electrician, and further, as follows (on direct examination):
“Q. What sort of insulation is used on those wires? A. All of our wires, on poles, have on *953 them insulation known as waterproof. Q. Do you know what sort of insulation the wires had at that time? A. I understand they had the usual insulation — triple plate-. Q. Where does the railway company get its wire from that it uses in this system? A. From standard manufacturers, and there are a number of them. * * * Q. In reference to insulation, what is the use or purpose of that insulation? A. The weather proof covering of a wire consists of a cotton tape impregnated with asphaltum; its value as an insulator is almost nothing, and it is simply used to prevent actual contact between the wires, in case they blow together or, accidentally, touch. When this insulation is perfectly new, it has some value as an insulator, but it is rapidly washed out, and, in the course of a few months, it is useless as an insulator. Q. What is the only safe insulation known in the electrical world? A. There are several classes of insulation used; they either use rubber, in some cases, paper, and in some cases, varnish, cambric, or silk. Q. Why don’t you use that kind of insulation? A. It would not be permanent in the weather, and it is not necessary ; there is no reason for other contractors coming in contact with our wires, on our poles; we rely on the class of insulation attached to the cross-arm. * * * (Cross-examination): * * * Q. What is the relative cost between the ordinary tape insulator that you testified to be used for these high current wires that your company use and the better insulation which gives more thorough protection from contact with the current? A. The better insulation is of a higher cost. Q. It is very much more expensive, is it not? A. It depends upon the extent to which it is carried; yes. Q. Mr. Black, you have testified that this tape insulation, which is used by your company on its high current wires, is only effective for a short while, and, after it is exposed to the atmosphere and weather, it is absolutely useless? A. Yes, sir. Q. Do you know how long this wire was up, on this particular corner? A. No, sir.”
Whether the agreement, under which defendant strings its wires on the poles of the telephone company, includes any provision with reference to the liability of the respective companies for damages for injuries to employes' doe's not appear. The fact that the employes of both companies are massed on the -side of the defendant would seem, however, to suggest an inference to that effect.
Opinion.
Defendant’s engineer testifies, in effect, that the so-called insulation upon its wires was never approved by the city electrician; that the so-called “weather proof tape, impregnated with asphaltum,” which defendant uses, is worth “almost nothing” for that purpose, even when new, and is rapidly washed out, and, in the course of a few months, becomes absolutely worthless; that he did not know how long the particular tape had been on the wire here in question; and that a better insulation could be obtained “at a higher cost” The city ordinance, upon the other hand, reads:
“Electric light and power conductors shall be secured by insulating fastenings, covered with an insulation which is waterproof and is not easily abraded. Whenever the insulation becomes impaired, it shall be renewed immediately. * * * In the construction of lines, the insulation to be used shall be approved by the city electrician, in writing. * * * All * * * corporations violating any of the provisions of this ordinance shall, on conviction, * * * be fined,” etc.
Comparing what defendant did with what the law required it to do, it is evident that it not only failed to comply with the obligations imposed by the ordinance, but that the course pursued- by it was more dangerous to human life than mere noncompliance, since it held out to the public an assurance of compliance upon which the uninformed might be led to rely, and thereby led, also, to sudden death. In Potts v. Shreveport Belt R. Co., 110 La. 1, 34 South. 103, 98 Am. St. Rep. 452, it appeared that (as in this case) plaintiff’s decedent was an employe of the telephone company, and that he lost his life by reason of accidental contact between a wire that he was handling and a “span” wire, charged with a high voltage, through lack of insulation of the main power wire which it was supporting. It does not appear that there was any ordinance of the city of Shreveport requiring the railway company to insulate its wires, but this court held that such obligation was imposed on it by the general law, the opinion on that point reading, in part, as follows, to wit:
“Using an agency of such subtle and dangerous power as electricity, the burden of the ut *955 most care and vigilance to keep all wires' connected with the trolley perfectly insulated was upon the company. * * * Defendant company knew that the employés of the telephone company must needs be in the street anc) on the poles and among the wires in the discharge of their duties. It knew that wires for the telephone service were continually being strung, and, since there was joint occupancy of the street by the two companies with their poles and wires and servants, it was all the more incumbent upon that one of the companies whose wires carried the deadly current to see to it that its transmission was effected with safety to all concerned.”
In Hebert v. Lake Charles, etc., Co., 111 La. 522, 35 South. 731, 64 L. R. A. 101, 100 Am. St. Rep. 505, it appeared that a wire of the telephone company, having been blown loose in a storm, fell across an uninsulated wire carrying a high voltage, belonging to the defendant, and that, defendant’s wire having been burned in two, one end of it came in contact with the husband of the plaintiff, who, at night, was seeking shelter from a shower, under a shed, with the result that he was killed. In the course of the opinion the court ,said:
“In the case at bar, the defendant was in default as to the condition of its wires at the point where the accident took place, not only as respects extraordinary storms, but as to events likely to happen, at any moment, from the simplest causes. It was failing, and had, for a long time before, failed, to have placed matters in such a condition as was required of it, affirmatively, to do, for the public safety not only by the general law, but as the condition upon which it had been granted the right or privilege of stringing its wires on the public streets. Had its wires been, in fact, in such a condition as they were required to be at the time of an extraordinary storm, a different case would be presented to us. * * * The care and true caution required at the hands of the defendant were not simply the ordinary care of a reasonably jn’udent man. In the case of Will v. Edison Electric Illuminating Co. [200 Pa. 540, 50 Atl. 161, 86 Am. St. Rep. 732], the Supreme Court-of Pennsylvania laid down the rule applicable to 'a company, like the defendant, making use of a dangerous agency; that it was bound to know, not only the extent of the danger, but to use the very highest degree of care practicable to avoid injury to every one who may be lawfully in proximity to its wires, and liable to come, accidentally or otherwise, in contact with them. The defendant (the court said), in accord with the common practice of electric companies, recognizes this obligation by insulating its wires; but the duty was not only to make the wires safe by proper insulation, but to keep them so by constant oversight and repairs.”
The duty thus referred to was imposed on the defendant now before this court, not only by the general law, but, categorically, by special ordinance, and it has been here shown, not only that defendant and the telephone company are joint occupants of the streets, but that they are joint occupants of the poles upon which they string their wires, and that defendant must have known that, in reaching the telephone wires, it would be necessary for the employés of the telephone company frequently to pass between,, and in close proximity to, its (defendant’s) heavily charged light and power wires.
The answer which defendant, speaking through its engineer, makes to the charge— that it has neglected to make proper provision with reference to the conditions stated for the handling of the dangerous agency which it controls — appears in the testimony of the officer mentioned, as follows:
“Q. What is the only safe insulation known in the electric world? A. There are several classes of insulation used; they are either rubber; in some cases, paper; and in some oases varnish, cambric, or silk. Q. Why don’t you use that kind of insulation? A. It would mpt be permanent in the weather, and it is no't necessary; there is no reason for other contractors coming in contact with our wires, on our poles; we rely on the class of insulation attached to the cross-arm.”
The city ordinance, which is here invoked, does not contemplate that the insulation shall be permanent, but it specifically provides that, whenever it becomes impaired, “it shall he renewed, immediately.” It may be that there is no reason why other eon-tractors should come in contact with defendant’s wires, on defendant’s poles, but the evidence shows that the pole upon which Moren lost his life was not defendant’s poie, but belonged to the company for which Moren was working, and, by agreement, was *957 so used by both companies that the employes of the telephone company were at all times, when handling their own wires, in danger of coming in contact with those of defendant. Whether it is necessary that defendant’s wires should be insulated is a matter which the city council has determined, in passing the ordinance, and defendant is without authority to decide that the ordinance applies only to those persons who may get in the way of the death dealing agency controlled by it as a result of ratiocination, rather than of imprudence, inadvertence, or accident. When, in the case to which we have above referred, Potts’ friend, Whitworth, saw him being burned up, by contact with a live wire, he did not stop to reason the question out, but, upon the impulse of the moment, laid his hands upon Potts, or the wire, or both, with a view of separating them, and was instantly killed, but this court held that his widow and minor child were nevertheless entitled to recover for his death. Whitworth v. Shreveport Belt R. Co., 112 La. 363, 36 South. 414, 65 L. R. A. 129. In a still later case, the court was dealing with a claim for damages, resulting from the nonobservance of an ordinance, reading in part as follows:
“Where there are two tracks, * * * the electric car coming in the opposite direction of the car that has stopped to permit a passenger * * * to get off * * * must stop * * * long enough to permit the passenger * * * who alights * * * to cross the tracks, if the passenger so desires.”
It was said that the passenger who had alighted from a car that had stopped was guilty of negligence in not looking, ’before attempting to cross the adjacent track, to see whether there was a car approaching thereon. This court, however, said:
“The very object of the ordinance was to protect the citizen, from the consequences of his own forgetfulness or imprudence in that respect. The ordinance was not enacted in the interest of any particular person, but in that of the general public, known to be not as careful as the danger of the situation would require.”
(And to that, it maj; be added, that as a railway company operates its electric cars through the streets of a city only by virtue of a special grant of authority, and not by the natural right that a citizen exercises in walking through the streets, it must operate them subject to the conditions of the grant or not at all.) The court (in the case referred to) then took up the defense that the plaintiff saw the car by which he was injured approaching, and deliberately took the chances of being able to cross the track ahead of it, and, in considering it, practically conceded that, if the facts were as stated, such defense would be good; in other words, that, notwithstanding the railway company might have violated the ordinance, such plea ^of contributory negligence might be successfully urged.- But it found against the defendant on the facts. Jones v. New Orleans Ry. & Light Co., 123 La. 1066, 49 South. 706. And the same thing may be said here; that is to say, if it were shown here that the decedent, knowing that defendant’s wires were practically uninsulated and bare, and knowing that contact between them and the wire that he was handling would result in his death, had recklessly placed himself in a position to render such contact probable, we should say that no damages could be recovered. But that is not the case presented. The defendant professed and now professes to have complied with the ordinance. Its learned counsel say, in the very able brief filed by them:
“In any event, the insulation was sufficient to prevent the wires, while in the air, from coming in contact, and that was all that the ordinance was intended to effect.”
And upon that theory defendant had covered its wires with a cheap material, which, from the beginning, was almost, and at the time of the accident was absolutely, worthless as an insulator. And there is nothing in the record which would authorize this court to hold that any one save defendant’s en *959 gineer was apprised either of the construction which defendant had placed upon the ordinance or of the condition resulting from the practical application of that construction. In our opinion, that construction is wholly unwarranted; and though it may be that the employes of both the railway and the telephone companies have usually dealt with the wires of the former as though they were bare, it does not follow that in a case where injury, resulting in death, has been inflicted upon a citizen, whether employed by the telephone company or not, by reason of his failure to obserye that precaution, and of his having assumed that the railway company had complied with the plain and imperative requirements of the law, the railway -company is to escape liability, upon the plea that it was the duty of the citizen to look out for himself. There are usually two factors of safety in any condition in which harm may befall one person by the act of another; the one, the instinct and obligation, of self-preservation, the other, the duty which every one owes to so use his own as not to injure another; and where that which one uses is an agency of an extraordinarily dangerous character, the law throws upon the user the burden of the greater care. No doubt, at this time, most people have certain information in regard to the danger of contact with electric wires, and yet it can readily be imagined that if a bare wire, carrying 2,300 volts, were stretched along a street of New Orleans, at the height of a handrail from the sidewalk, the loss of life would be appalling, and the danger from such wires, strung, as they are, 30 feet above the sidewalk, is only less, to those who are required to work among them, in proportion, partly to their experience, but, mainly, to the capacity of the individual to maintain, at all times, absolute control of the operations of his mind and his physical members. He who, under such circumstances, allows his thoughts to wander, or his hand to move without due consideration, dies. As to the man whose death is the cause of this litigation, there is nothing in the record to show that he knew that the insulation on defendant’s wires was in the condition described by defendant’s engineer. It may be conceded that, like others who work among such wires, it was his habit, ex abundanti cautela, to make use of ropes and gloves, but, so, a business man may habitually require more security than he needs for the money that he loans, and yet, he is not necessarily incautious, because, on a particular occasion, he requires only that which, under the law, appears to be sufficient.
There is no direct evidence in the record that Horen was not using all the appliances with which, it is said, he should have been supplied. Neither of the witnesses who saw him on the pole was asked whether he had a rope attached to the wire that he was carrying. Mrs. Behrens testified that he carried a wire up with him, but, being asked whether he carried it in his hand or .attached to his body, said she did not know. Washington, the negro gardener (the only other witness who is said to have seen him climbing the pole), testified that he carried one end of a wire, in his hand, but he also testifies that he went to the top of the pole, and that he wore gloves, and he was not-asked whether there was any rope attached to the wire. In fact, no one’s attention was attracted to that point. Mrs. Moren says that he told her that he ascended the pole with a wire in his hand; but Superintendent Powell testifies that he did not ask Moren whether he used a rope or gloves, and that Moren did not tell him. We are therefore in doubt as to how he would have answered that question if it had been asked, and speaking as he was, to his wife, in the very agony of impending death, he might not have considered it any more worth, mentioning than did Mr. Powell; or, Mrs. Moren, in attempting to repeat what lie *961 said, may have allowed it to escape her. As to the gloves, it appears to us to be remarkable that no witness was called, save the boy Dodge, who saw Moren whilst he was on the crossing, where he fell, or who could tell anything about the manner of his removal into Mrs. Landry’s yard, and Dodge merely saw him fall, but did not go near him and did not know whether he had gloves on or not. Mrs. Behrens and Mrs. Govan say that they saw no gloves near him, as he lay in the yard, but it was not to be expected that they should. Some time had then elapsed since his fall, and those who had handled him in the meanwhile might very well, as a matter of common humanity, have cut the gloves from his hands. Counsel for defendant say : ,
“Moren was an experienced lineman, and knew that electric wires were dangerous. * * When Moren investigated the trouble he was sent to repair, he knew that it would be dangerous for him to undertake to repair it without help. The evidence shows that Moren was an experienced lineman, and knew the dangerous nature of the work he was engaged upon. * * * He was engaged in work requiring knowledge of different kinds of conductors' of electricity and of the methods of .handling such conductors, and, necessarily knew the dangerous consequences to himself should he in any way permit his body to become part of the electric circuit by coming in contact with an electrically charged and grounded conductor.”
And Superintendent Powell testifies that Moren was entirely familiar with his duties and with the dangers incident thereto. But, if all that be as stated, why should it be assumed, in absence of positive evidence to that effect, that in an emergency, when he was trying to get along without a helper, Moren should have neglected precautions for his own safety which, according to the view of defendant’s witnesses, would not have been neglected by the most thoughtless apprentice? Again, and accepting for the moment the construction which the defendant places on the city ordinance, it was at least bound to so cover its wires as to prevent them, “while in the air, from coming in contact,” by which we understand the learned counsel to mean that the covering should be of such a character as to prevent, in case of casual contact, the current from one wire being discharged into the other. But the consensus of the testimony for the defense seems to be that it was by just such casual contact between the wire that Moren was carrying and defendant’s primary wire that Moren received the shock which resulted in his death. It is said that the impaired condition of the insulation was obvious, and that there should be no recovery on that account; but, the evidence does not sustain that theory. Murphy, defendant’s foreman, who inspected the wires a few hours after the accident, says he found some “few small, little, places” on the 2,300 volt wire. And Meyer, the assistant foreman, who made an inspection the next day, says:
“Well, the wires were all right — a little weather-beaten. I saw a little spot where the man got burned, and that is the only place that I could see any wrong.”-
Both the witnesses went there for the express purpose of finding defects, if any there were, and the only defects which they found were those which were marked by the impress of Moren’s fingers, or the skin which had been burned off of them; indications which, of course were not to be seen by Moren.
Our conclusion is that plaintiff is entitled to recover. It appears that Moren was 36 years old and was earning $75 per month, and that he left a widow and a minor child (a girl), between two and three years old, both in destitute circumstances. The suit is brought, in the right of the decedent, for his suffering prior to his death, and, in the right of the widow and minor, for loss of companionship and support, the total amount claimed being $25,000. We are of opinion that this total should be reduced to $10,000, divided as in the decree.
*963 It is therefore ordered, adjudged, and decreed that the judgment appealed from he annulled, avoided, and reversed, and that there now be judgment in favor of the plaintiff, Mrs. Linnie Cornelia Wilson, widow of Charles Moren, individually, and as guardian of her minor child, Ruth Evelyn Moren, and against the defendant, the New Orleans Railway & Light Company, in the sum of $10,-000. with legal interest thereon from the date at which this judgment shall become final until paid; one half of said amount to inure to said widow, individually, and the other half to be paid to her, as guardian, for the use and benefit of said minor. It is further decreed that defendant pay all costs.
PROVOSTY, J., dissents.