**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

LORI OBERSON, Legal Guardian for
Brian Musselman, an incapacitated
person; KIMBERLEE MUSSELMAN,
individually and as the Natural
Mother of Devon Musselman, a
minor,

       *Plaintiffs-Appellees-
Cross-Appellants,*

     v.

UNITED STATES DEPARTMENT OF
AGRICULTURE, FOREST SERVICE,
       *Defendant-Third-Party
Plaintiff-Appellant-
Cross-Appellee,*

     and

STATE OF MONTANA, by and
through the Department of Fish,
Wildlife and Parks; WEST
YELLOWSTONE CHAMBER OF
COMMERCE,

       *Defendants-Third-
Party Plaintiffs,*

     v.

JAMIE LOUIS LEINBERGER; PATRICK
B. KALAHAR; TIM A. JOHNSON,
       *Third-Party Defendants.*

Nos. 04-35268
04-35315

D.C. No.
CV-99-00048-DWM

OPINION AND
ORDER

Appeal from the United States District Court
for the District of Montana
Donald W. Molloy, District Judge, Presiding

2865

Argued and Submitted
December 7, 2005—Seattle, Washington

Filed March 20, 2006

Before: Ronald M. Gould and Marsha S. Berzon,
Circuit Judges, and William W Schwarzer,*
Senior District Judge.

Opinion by Judge Schwarzer

---

*The Honorable William W Schwarzer, Senior United States District
Judge for the Northern District of California, sitting by designation.

## OPINION AND ORDER

SCHWARZER, Senior District Judge:

### I.  CERTIFICATION OF QUESTIONS OF LAW

Pursuant to Rule 44(c) of the Montana Rules of Appellate Procedure, we respectfully request the Montana Supreme Court to exercise its discretion to adjudicate the following questions of Montana law:

1.  Does the gross negligence standard of care in the snowmobile liability statute, Mont. Code Ann. § 23-2-653 (1996), violate the Montana equal protection clause, Mont. Const. art. II, § 4?

2.   If the snowmobile liability statute's gross negligence standard is unconstitutional, does the recreational use statute's willful or wanton misconduct standard of care, MONT. CODE ANN. § 70-16-302(1) (1996), apply in its place?

3.   If neither the snowmobile liability statute nor the recreational use statute provide an applicable standard of care, does the ordinary care standard, MONT. CODE ANN. § 27-1-701, apply?

The answers to the certified questions will be determinative of the appeal pending in our court in this action. We have found no controlling Montana appellate decisions, constitutional provisions, or statutes for these questions. We acknowledge that your Court may decide to reformulate the questions, and that our phrasing of the questions is not intended to restrict your Court's consideration of this request. Relevant facts concerning the certified questions are stated below. We would be grateful for any guidance your Court can give us, whether or not directly responsive to the questions as we have phrased them.

## II.   PROCEDURAL BACKGROUND

Brian Musselman (Musselman) was gravely injured in a snowmobile accident on a National Forest trail. Lori Oberson, his legal guardian, and others brought this action against the United States under the Federal Tort Claims Act (FTCA), 28 U.S.C. §§ 2671-2680, alleging that the United States Forest Service negligently failed to correct or warn of a dangerous condition on the Big Sky snowmobile trail where Musselman was injured. The United States filed a third-party complaint against Jamie Leinberger (Leinberger), Patrick Kalahar (Kalahar) and Tim Johnson (Johnson), alleging that their negligence caused Musselman's injuries. Default was taken against Johnson. Kalahar settled with plaintiffs and was dismissed before trial. Following a bench trial, the district court entered judgment for plaintiffs, awarding damages of $11,296,800

and apportioning liability 40% to the Forest Service, 50% to Leinberger and 10% to Musselman.[1]

The Forest Service appealed, citing as error the district court's refusal to apply the discretionary function exception of the FTCA and its finding of negligence. Plaintiffs cross-appealed from the district court's liability allocation of 50% to third-party defendants and its methodology for calculating life expectancy.[2] We affirm the district court in all respects except that we leave for future resolution the determinative question of the appropriate standard of care pending the disposition of this request for certification.

---

[1]The opinion of the district court is reported at 311 F. Supp. 2d 917 (D. Mont. 2004).

[2]Plaintiffs advance three contentions on their cross-appeal. We find each to be without merit.

First, they contend that the district court erred in holding Kalahar and Leinberger jointly and severally liable for Musselman's injuries and thereby apportioning 50% of the liability to Leinberger, the remaining tortfeasor. The court correctly rejected plaintiffs' argument that a meeting of the minds had to be proved to establish joint and several liability, relying on the leading case of *Summers v. Tice*, 199 P.2d 1 (Cal. 1948), which held that where two tortfeasors are each negligent but it cannot be determined whose negligence was the actual cause of the injuries, each is liable for the entire damage. *See Azure v. City of Billings*, 596 P.2d 460, 470 (Mont. 1979) (citing *Tice*, 199 P.2d 1).

Second, they contend that the district court violated the "empty chair" rule by factoring Kalahar's negligence in the allocation of 50% liability to Kalahar and Leinberger. The court, however, specifically acknowledged that no liability can be apportioned to a defendant who has settled and allocated liability solely to Leinberger. *See Azure*, 596 P.2d at 469.

Third, they contend that the district court erred in accepting the Forest Service's expert's estimate of Musselman's life expectancy, which did not take into account the quality of medical care provided to Musselman. The court's life expectancy finding is a finding of fact reviewed for clear error. The finding was supported by substantial evidence and has not been shown to be clearly erroneous. *Sines v. United States*, 430 F.2d 644, 645 (9th Cir. 1970).

## III.    FACTS

### A.    THE ACCIDENT

On February 25, 1996, Musselman, an expert snowmobiler, joined friends to ride on snowmobile trails in Yellowstone National Park and Gallatin National Forest. After dark, Musselman and his friends rode to a restaurant some nine miles north of West Yellowstone, Montana. Musselman, joined by Kalahar, Johnson, and Leinberger, rode on the Big Sky Trail, a groomed snowmobile trail managed by the U.S. Forest Service. During the trip, Johnson and Kalahar were riding competitively at speeds up to 60 mph.

At the restaurant, Musselman and his friends joined a group of some twenty people to cook steaks, drink beer, and tell stories. Musselman and Kalahar each drank at least three beers, Johnson consumed three to four beers, and Leinberger consumed between four and eight beers. Upon leaving the restaurant around 10:00 p.m., Leinberger was heavily impaired by alcohol, Johnson and Kalahar were impaired to a lesser degree, and Musselman was not impaired and was fully able to operate his snowmobile.

Musselman and Johnson left the restaurant first, followed by Kalahar and Leinberger. No member of the group had previously traveled on the stretch of the Big Sky Trail immediately adjacent to the restaurant. The Forest Service had posted a speed limit of 45 mph on its Yellowstone-area trails, but was aware that snowmobilers regularly traveled this stretch of trail at speeds in excess of 60 mph. Musselman took off quickly from the restaurant and continued at a pace keeping him in front of the other riders. He was not exceeding 45 mph when he reached the accident site. Johnson, Kalahar, and Leinberger approached the accident site at approximately 50-55 mph.

The stretch of trail approaching the accident site is flat and smooth for roughly a quarter of a mile. It then drops suddenly

down a steep hill, the site of the accident. There it loses seventeen feet of elevation over approximately eighty feet, an 11.5 degree pitch or 25% slope. Musselman was the first rider to come to the hill, negotiating it safely and landing his snowmobile under control slightly off the trail. Johnson was next over the hill, crashing his machine at the bottom. After Johnson's crash, Musselman got off his machine for reasons unknown, although the district court found that he was likely trying to help Johnson or warn the approaching riders of the drop. As Musselman stepped on the trail, Kalahar and Leinberger came flying over the hill side-by-side. One of the riders hit Musselman's head, causing catastrophic brain injuries. The injury left Musselman unable to swallow, speak, understand complex communication, and independently conduct activities of daily living. He currently resides in an adult care facility.

The court had difficulty reconstructing the scene immediately following the accident given the shambolic post-accident investigation.[3] However, it found that Musselman was lying on the groomed portion of the trail between his and Leinberger's machine, with his head facing away from the hill. Leinberger's machine was still on the groomed trail with its front end, windshield, handlebars, tunnel area, skis, cowling, rear bench rest, and motor mounts damaged. Kalahar's machine suffered broken engine mounts, a damaged windshield, and bent handlebars. Johnson's machine had a damaged windshield, which he replaced the morning after the accident before the machine could be inspected.

There were no eyewitnesses to the accident. Leinberger testified that he did not believe he hit Musselman because he

---

[3]The investigators lost notes they had taken that night, took only two photographs of the scene, did not prevent the snowmobiles from being moved, spoiled the blood sample drawn from Musselman the night of the accident, and did not order blood drawn from the other riders involved in the accident.

"didn't hit an object that was going to move." Kalahar testified that he was positive he did not hit Musselman. Physical evidence and attempts at reconstruction revealed only that a snowmobile track hit Musselman in the helmet while he was on the trail and that the impact came from the right to left side.

Plausible explanations can be given for either Leinberger or Kalahar hitting Musselman. Leinberger's machine tumbled after the crest of the hill either because he applied his brakes before becoming airborne or because he hit Musselman while airborne, forcing the nose of his snowmobile down. Alternatively, the line of travel for Kalahar's machine places it in line with Musselman's likely location at the moment of the accident. Additionally, Kalahar reported hitting the ground and bouncing, an account consistent with hitting Musselman and then hitting the ground.

## B.   THE TRAIL

Musselman's accident occurred at a sudden and steep drop on the Big Sky Trail. At the time of the accident, there were no signs warning of the hill or instructing riders to slow down. Numerous witnesses suggested at trial that it was unusual for such a drop not to be signed and that a trail of such abrupt steepness was rare.

The Forest Service has sole responsibility for identifying and correcting hazards on the Big Sky Trail. To identify hazards, the Forest Service engages in a process called "warranting." The program manager for the Gallatin National Forest described the process as "identifying the hazards that our average, prudent, reasonable rider would not expect based on a spectrum of users that we had out there." Forest Service employees identify hazards during warranting by riding the trail at 35 mph during the day. Upon identifying a hazard, the Forest Service closes the trail, corrects the hazard, or warns the user. The Forest Service does not warrant trails at night,

on the assumption that reflectors and a rider's judgment as to the appropriate speed will provide sufficient protection.

The Forest Service originally warranted the Big Sky Trail in 1993, at which point it did not identify the hill as a hazard.[4] The speed limit at the site of the accident, as on all other trails in the region, was then 35 mph. A month before the accident, the Forest Service implemented a new speed limit of 45 mph solely for consistency with the speed limit in effect in adjacent Yellowstone National Park. The Forest Service did not warrant the trails at 45 mph.

Sixteen days before Musselman's accident, two snowmobiles and a snow grooming machine were involved in an accident at the hill in question. The snowmobiles were traveling in clear weather at night, going 35-40 mph, which the investigation report characterized as too fast based upon the conditions. The two snowmobiles collided with the grooming machine immediately after coming over the crest of the hill. In a Forest Service re-creation following the accident, an observer 100 feet back from the hill could not see the grooming machine, equipped with two headlights and a flashing light on top, when it was at the bottom of the hill. Although the collision caused only minor damage to the involved machines and no personal injury, the district court found that the accident could have resulted in serious injury to the riders.

## C. THE DISTRICT COURT DECISION

The district court held that the Forest Service's decisions whether to warrant the trails and how it would conduct the

---

[4]Following the accident, in November 1996, the Forest Service rewarranted the trail, making several adjustments to the site of the accident. The Service realigned the approach to the hill, replacing the straight, flat approach with a curve leading through trees. Additionally, signs were added indicating the upcoming curve and subsequent hill. The warranting form also noted that the hill can "sneak up on a person" at night and that the hill's crown was scheduled for reduction.

process were grounded in policy considerations and were the type of discretionary decisions Congress intended to shield from tort liability. Once the decision to warrant the trails was made, however, the agency had a duty to accomplish that task with reasonable care. The Service's failure to warn of the hazardous hill was not the result of a decision grounded in public policy or of a choice among competing policy considerations. The court concluded that the Forest Service's failure to correct or warn of this hazard was not the type of discretionary decision that is shielded from tort liability.

Having determined that the plaintiffs could sue the Forest Service, the district court considered whether the Service owed them a duty under Montana law. It held that the existence of a duty was not negated by the Montana snowmobiling statutes relieving parties of liability for risks "inherent in the sport of snowmobiling." Mont. Code Ann. §§ 23-2-651, 653-54 (1996). The hill, it found, was not an inherent risk as a "variation in terrain" because the Forest Service had notice of the danger and could have eliminated it with ordinary care by altering the trail and/or posting a warning.

The court then addressed the applicable standard of care. First, it held the Montana snowmobile liability statute's gross negligence standard, Mont. Code Ann. § 23-2-653(2) (1996) (amended 1997), to be unconstitutional under Montana's equal protection clause, Mont. Const. art. II, § 4, on the authority of *Brewer v. Ski-Lift, Inc.*, 762 P.2d 226 (Mont. 1988). Next, the court declined to apply Montana's recreational use statute in its place, holding the statute's willful or wanton misconduct standard, Mont. Code Ann. § 70-16-302(1), to be preempted in this instance by the more specifically applicable snowmobile liability statute. In the absence of other applicable standards, the court imposed a duty of ordinary care. The court found the ordinary care standard, adopted in the 1999 revision of the snowmobile statute in place of the gross negligence standard, to be constitutional. Finally, the district court held that the Forest Service breached its duty of

ordinary care to plaintiffs and that the breach contributed to Musselman's injuries.

The court next considered whether any of the other parties shared responsibility for the accident. It concluded that Musselman exposed himself to severe injury by walking onto the trail and, further, that Leinberger and Kalahar, given their speed and alcohol-impaired state, and the evidence of contact with Musselman, breached their duty to avoid injury to others. Since it proved impossible to determine whether it was Leinberger or Kalahar who hit Musselman, the court held both jointly and severally liable for Musselman's injuries.

The court apportioned 40% of the liability to the Forest Service, 10% to Musselman, and 50% to Kalahar and Leinberger. Since Kalahar had settled with Musselman and been dismissed from the suit as a result of his settlement with Musselman, the court assigned the 50% share of liability solely to Leinberger on the ground that he and Kalahar had acted in concert. In calculating damages, the district court used a future life expectancy of 12.8 years. After reducing the amount by 10% for Musselman's liability, the court entered judgment for plaintiffs in the amount of $10,167,120.

## IV. DISCUSSION

### A. FTCA's DISCRETIONARY FUNCTION EXCEPTION

[1] The United States "can be sued only to the extent that it has waived its immunity." *United States v. Orleans*, 425 U.S. 807, 814 (1976). The FTCA waives the federal government's immunity from suit for a discrete class of lawsuits. 28 U.S.C. §§ 2671-80 (2005). This waiver, however, is limited by the discretionary function exception, precluding "[a]ny claim based upon an act or omission of an employee of the Government . . . based upon . . . a discretionary function or duty." 28 U.S.C. § 2680(a). The Supreme Court has estab-

lished a two-part test for application of the discretionary function exception. *See United States v. Gaubert*, 499 U.S. 315, 322-25 (1991); *Berkovitz v. United States*, 486 U.S. 531, 536-37 (1988). First, courts inquire as to whether the challenged action was discretionary, as opposed to being governed by mandatory statute, policy, or regulation. *Whisnant v. United States*, 400 F.3d 1177, 1180-81 (9th Cir. 2005) (summarizing *Berkovitz* test). Second, if the court finds the action to have been discretionary, it then determines whether the action involved "a decision susceptible to social, economic, or political policy analysis." *Id.* at 1181; *see also O'Toole v. United States*, 295 F.3d 1029, 1033-34 (9th Cir. 2002). If the challenged action was both discretionary and policy driven, the discretionary function exception bars FTCA claims. We review de novo the district court's application of the discretionary function exception. *Marlys Bear Med. v. United States*, 241 F.3d 1208, 1213 (9th Cir. 2001).

**[2]** There is no serious claim that the Forest Service's actions in this case were mandated by statute, policy or regulation. The question is whether its discretionary actions were policy driven. The Forest Service argues that the absence of a warning sign at the hill was the direct result of the 1993 warranting process protected by the discretionary function exception. But as the Forest Service's brief explains, the warranting process was conducted at a route design speed of 35 mph and did not identify the hill as a hazard. Later, in 1996, the Service raised the speed limit to 45 mph—the limit in effect at the time of the accident—simply to conform to the speed limit in Yellowstone Park, resulting in the creation of the hazardous condition at the hill. Because the trails were never warranted at the higher speed limit of 45 mph, the Service is not shielded by the warranting process.

**[3]** The Service's argument that the decision not to rewarrant the trails in 1996 was protected by the discretionary function exception misses the point. Undoubtedly, its decision whether to warrant trails is protected, as is its decision to

adopt a 45 mph speed limit. But not having warranted the trails at 45 mph, the Service cannot claim that its failure to warn of hazardous conditions at that speed is protected by the discretionary function exception.

[4] Inasmuch as the warranting process does not shield the Service under the circumstances of this case, we must consider whether the failure to post a warning at the hill is protected by the discretionary function exception. Whether it is protected depends on whether the Service's action—or inaction—was grounded in social, economic or political policy. Other than its (misplaced) reliance on the 1993 warranting process, the Service offers no evidence to show that its failure to post a warning was the result of a policy decision. This case is not like *Childers v. United States*, 40 F.3d 973 (9th Cir. 1995), where the decision not to post signs and to close portions of Yellowstone National Park were the result of policy decisions regarding how best to manage the park during winter. The court explained:

> Unable to maintain all the trails in the park, cognizant that posting warning signs would inadvertently attract visitors to unmaintained trails, and unable to post signs throughout the park, NPS could only decide to close large portions of the park, or to keep the park open, provide visitors with information on the hazards, and take steps to discourage visitors from going to hazardous areas.

*Id.* at 976. Similarly, in *Valdez v. United States*, 56 F.3d 1177 (9th Cir. 1995), the failure to install warning signs alongside a potentially hazardous stream was held to "implicate[ ] a choice between the competing policy considerations of maximizing access to and preservation of natural resources versus the need to minimize potential safety hazards." *Id.* at 1180; *see also Blackburn v. United States*, 100 F.3d 1426, 1434 (9th Cir. 1996) (following *Valdez* and *Childers*, holding the decision how to warn public of the hazard of diving off a bridge

in Yosemite National Park involved considerations of visitor enjoyment, preservation of historical features, minimizing manmade intrusions and protection of wildlife and the environment).

**[5]** The case before us is different. It is more nearly analogous to cases such as *Summers v. United States*, 905 F.2d 1212, 1215-16 (9th Cir. 1990), holding the discretionary function did not protect the Park Service where it had failed to warn visitors of the danger of stepping on hot coals in a fire ring in the Golden Gate National Recreation Area. The court found that "NPS's failure to identify and warn of the danger to barefoot visitors of hot coals on park beaches resembles more a departure from the safety considerations established in Service policies . . . than a mistaken judgment in a matter clearly involving [policy] choices." *Id.* at 1216. Similarly, *Faber v. United States*, 56 F.3d 1122, 1127 (9th Cir. 1995), held that the Forest Service's failure to post a sign warning of danger of diving off a waterfall in a National Forest was not protected by the discretionary function exception. The court stated: "It would be wrong to apply the discretionary function exception in a case where a low-level government employee made a judgment not to post a warning sign . . . ." *Id.* at 1125; *see also Seyler v. United States*, 832 F.2d 120, 123 (9th Cir. 1987) (stating "we doubt that any decision not to provide adequate signs would be of the nature and quality that Congress intended to shield from tort liability") (internal quotation marks and citation omitted). In *Sutton v. Earles*, 26 F.3d 903, 910 (9th Cir. 1994), the court held the Navy's decision not to post speed limit signs after creating a hazard to navigation not protected by the discretionary function exception, stating that "[a] decision not to warn of a specific, known hazard for which the acting agency is responsible is not the kind of broader social, economic or political policy decision that the discretionary function exception is intended to protect." Here, the Forest Service knew of the hazard through its own investigation, which disclosed that sixteen days prior to Musselman's accident the hill in question had been the site of a

potentially serious collision between a snow grooming machine and two snowmobiles. In the absence of any evidence that the failure to post a warning or remedy the hazard was the product of a policy choice, we conclude that the discretionary function exception did not shield the Forest Service from liability.

## B.  THE GOVERNMENT'S NEGLIGENCE

"A negligence action requires proof of four elements: (1) existence of a duty; (2) breach of the duty; (3) causation; and (4) damages." *Gentry v. Douglas Hereford Ranch, Inc.*, 962 P.2d 1205, 1209 (Mont. 1998).[5] The district court addressed the four elements required for a negligence action. In holding that the government had breached its duty to Musselman, the district court applied a standard of ordinary care under Montana law. As we discuss later in this order, the government disputes the application of that standard, contending that the standard is either gross negligence or willful or wanton misconduct. Because we leave this issue for determination by the Montana Supreme Court by way of this certification, we defer its resolution pending a response from that Court. However, our order resolves all other issues and leaves only the standard of care as determinative of this appeal.

### 1.  *The Government's Duty*

#### a.  Inherent risk

[6] To establish a claim of negligence, a plaintiff must first demonstrate the existence of a duty of care. *Gaudreau v. Clinton Irrig. Dist.*, 30 P.3d 1070, 1073 (Mont. 2001). "The existence of a legal duty can be determined as a matter of law." *Lopez v. Great Falls Pre-Release Servs., Inc.*, 986 P.2d 1081, 1087 (Mont. 1999). The Forest Service owed a duty of care to all persons which it could reasonably foresee would use the

---

[5]The Forest Service does not dispute the trial court's damage award.

snowmobile trail. *Id*.; *see Busta v. Columbus Hosp. Corp.*, 916 P.2d 122, 134 (Mont. 1996) ("Duty . . . is measured by the scope of the risk which negligent conduct foreseeably entails" (quoting *Mang v. Elaisson*, 458 P.2d 777, 781-82 (1969)).

The government argues that Musselman cannot show the existence of a duty because Montana's snowmobile statute places all legal responsibility for risks "inherent in the sport of snowmobiling" on the snowmobiler. Mont. Code Ann. § 23-2-654 (1996). It argues that the statute relieved the government of liability for the failure to warn Musselman of the "variation in terrain" on which he was injured. § 23-2-654(1). The government, however, overstates the law.

**[7]** We review de novo a district court's interpretation of state law. *See Rabkin v. Or. Health Scis. Univ.*, 350 F.3d 967, 970 (9th Cir. 2003). To determine whether the government had a duty to warn Musselman of the hill's hazardous nature, we must interpret the meaning of "inherent risk" in the Montana snowmobile statute. Courts considering the meaning of "inherent risk" or similar language in similar statutes have held that language to shield defendants from liability for risks that are integral parts of a sport and, therefore, could not be eliminated by a defendant with ordinary care. *See Brewer v. Ski-Lift, Inc.,* 762 P.2d 226, 231 (Mont. 1988); *see also Bouchard v. Johnson*, 555 N.W.2d 81, 84 (N.D. 1996); *Knight v. Jewett*, 834 P.2d 696, 705-06 (Cal. 1992); *Clover v. Snowbird Ski Resort*, 808 P.2d 1037, 1047 (Utah 1991); *Wright v. Mt. Mansfield Life, Inc.*, 96 F. Supp. 786, 791-92 (D. Vt. 1951). Here, the risk under consideration is not a variation in terrain but the lack of a warning sign at a hazardous variation in terrain. Given the Service's comprehensive safety program designed to standardize hazard notification on trails, the negligent failure to post a warning sign is not an integral part of the sport of snowmobiling. The risk from such a failure could be eliminated by the exercise of ordinary care. We conclude that the snowmobile statute's "inherent risk" provision did not

shield the Forest Service from liability for failure to provide a warning of a known hazard on the Big Sky Trail.

b.   The standard of care

To determine whether the government breached its duty to Musselman, the district court analyzed the Forest Service's conduct under the ordinary care standard. The district court arrived at this standard of care only after rejecting two alternative standards prior to trial. To the extent relevant to the questions certified to the Montana Supreme Court, we recite the grounds upon which the district court based its pretrial rulings.

[8] First, the district court barred affirmative defenses based upon the 1996 snowmobile statute's gross negligence standard, MONT. CODE ANN. § 23-2-653, holding that standard of care to violate the Montana equal protection clause, MONT. CONST. art. II, § 4. In so doing, the district court relied on *Brewer*, in which the Montana Supreme Court held unconstitutional a statute eliminating legal recourse against ski area operators for skiers suffering injury by virtue of their participation in the sport of skiing "regardless of the cause [of injury] and regardless of the presence of negligence or intentional conduct on the part of the ski area operators." 762 P.2d at 230. According to the district court, the "special rights" created by the 1996 snowmobile statutes gross negligence standard were the same as those created by the statute considered in *Brewer*— which removed *all* liability—and similarly were not rationally related to the statutes purpose. Here, the district court based its analogous treatment of the ski area operator and snowmobile statutes upon its unpublished order in *Riska v. USDA*, CV-96-63-BU-DWM (D. Mont. Oct. 14, 1997) (holding 1996 snowmobile statute's gross negligence standard unconstitutional under *Brewer*). We have found no Montana court decisions resolving the constitutionality of the 1996 snowmobile statute's gross negligence standard or *Brewer*'s

applicability to gross negligence standards of care in other statutes.

**[9]** Second, the district court barred affirmative defenses based upon the recreational use statute's willful or wanton misconduct standard, MONT. CODE ANN. § 70-16-302(1). According to the district court, the parties agreed that the Montana legislature "carved snowmobiles out of the general recreational use statute by enacting the specific snowmobile liability statutes." The government argued the recreational use statute's willful or wanton misconduct standard still should apply in place of the snowmobile statute's rejected gross negligence standard. The district court, however, held the recreational use statute to be preempted by the more specific snowmobile liability statute in this instance. Having found the recreational use statute's standard of care inapplicable, the district court instructed the parties to proceed under the catch-all ordinary care standard, MONT. CODE ANN. § 27-1-701, citing *Brewer*, 762 P.2d at 230, and *Mead v. M.S.B., Inc.*, 872 P.2d 782, 786-87 (Mont. 1994). We have found no Montana court decisions addressing whether the snowmobile liability statute's standard of care preempts the recreational use statute's standard in this context.

**[10]** The Montana Supreme Court's decision regarding the appropriate standard of care will be dispositive of this appeal. If the Court endorses the application of the ordinary care standard, we find no reason to overturn the district court's decision. However, if the Court holds the gross negligence or willful or wanton misconduct standard applicable, we must remand the case to the district court for a new trial under the appropriate standard of care.

### 2. *Causation*

The government contends first that there was no causal relationship between the absence of a warning and Musselman's injury. We review a district court's findings of both

cause-in-fact and proximate cause for clear error. *Husain v. Olympic Airways*, 316 F.3d 829, 835 (9th Cir. 2002) (reviewing mixed questions of law and fact regarding proximate cause); *United States v. Hackett*, 311 F.3d 989, 991 (9th Cir. 2002) (reviewing factual findings regarding causation).

**[11]** "[A] party's conduct is a cause-in-fact of an event if the event would not have occurred but for that conduct." *Gentry*, 962 P.2d at 1209 (internal quotation marks and citation omitted). The record established that when approaching the hill at only 35 mph (below the speed limit), a snowmobile would leave the ground and sail over the crest of the hill with the operator losing control and unable to see objects at the foot of the hill, as occurred in the earlier collision of a snowmobile with the snow groomer at the same location. As the district court found, "[p]lacing a sign on the approach to this hill would have changed the riders' expectancies and informed them that the approaching hill was far steeper than the usual gentle grade." *Oberson v. United States*, 311 F. Supp. 2d 917, 959 (D. Mont. 2004). Musselman, having landed off the trail, saw Johnson on the trail and reentered it, as the court found, to assist or warn the other snowmobilers of the danger. He was hit when Kalahar and Leinberger, unwarned, sped over the hill's crest and lost control of their snowmobiles as a result of the unexpected steep grade. The court found that "but for the hill and the associated problems found in the facts, the accident would not likely have occurred." Cause-in-fact, therefore, was established on the record which showed that the Service's conduct, "in a natural and continuous sequence . . . helped produce [Musselman's] injury and [the injury] would not have occurred without it." *Busta*, 916 P.2d at 139.

The Forest Service's principal contention is that Kalahar and Leinberger's speed and intoxication combined with Musselman's carelessness in entering the trail were independent intervening causes. Even if its failure to post a warning sign were found to be a cause-in-fact of Musselman's injuries, the

Forest Service argues, the riders' acts were unforeseeable intervening causes, sufficient to prevent a finding that the Forest Service's failure to warn was a proximate cause of the accident.

Where, as here, the existence of independent intervening acts is alleged, causation requires proof of both cause-in-fact and proximate cause. *Gentry*, 962 P.2d at 1209. "When two or more causes concur to bring about an event, then cause-in-fact is established by the 'substantial factor' test." *Sletteland v. Roberts*, 16 P.3d 1062, 1067 (Mont. 2000) (citation omitted). Under that test, a party held to have contributed to an event is not "absolved from that responsibility upon the ground that the identical harm would have occurred without [its involvement]." *Rudeck v. Wright*, 709 P.2d 621, 628 (Mont. 1985). As the foregoing discussion shows, the Service's maintaining the hazardous and unwarned condition of the hill contributed to the event in which Musselman was injured.

**[12]** Proximate cause is established when a party could reasonably foresee that its conduct would result in injury. *Busta*, 916 P.2d at 135. An independent intervening act will not bar liability if it is "one that the defendant might reasonably foresee as probable or one that the defendant might reasonably anticipate under the circumstances." *Estate of Strever v. Cline*, 924 P.2d 666, 672 (Mont. 1996). However, "[t]he particular resulting injury need not have been foreseeable." *Hinkle v. Shepherd Sch. Dist. #37*, 93 P.3d 1239, 1245 (Mont. 2004).

**[13]** That serious accidents involving snowmobiles could occur at the site of the hill was foreseeable. The district court found that the potential severity of the earlier snow groomer accident, even though no one was injured, placed the Forest Service on notice that serious injury could result from its failure to post a warning. That riders would operate snowmobiles negligently was foreseen by the Service. Its awareness of rid-

ers' high speeds was a motivation for implementing a trail warranting process. And its awareness of intoxicated persons operating snowmobiles is reflected in the Code of Federal Regulations' express prohibition of operation of a snowmobile while intoxicated in a National Park or Forest. 36 C.F.R. §§ 2.18, 4.23 (1996). Thus, Kalahar's and Leinberger's negligence was foreseeable.

**[14]** The Montana Supreme Court has long recognized the rescue doctrine.[6] Under that doctrine, "one who, observing another in peril, voluntarily exposes himself to the same danger in order to protect him . . . may recover for any injury sustained in effecting the rescue against the person through whose negligence the perilous condition has been brought about." *Bracey v. Nw. Improvement Co.*, 109 P. 706, 707 (Mont. 1910); *see also Brown v. Columbia Amusement Co.*, 6 P.2d 874, 878 (Mont. 1931). Although the cases speak broadly in terms of liability, they recognize that liability is intertwined with causation in the application of the doctrine. Thus, in *Kiamas v. Mon-Kota, Inc.*, 639 P.2d 1155, 1159 (Mont. 1982), the court held that causation had not been established where action was no longer required to avert a threatened harm. In its discussion of "Scope of Liability (Proximate Cause)," the Restatement of Torts (Third) (Proposed Final Draft) states, with respect to rescuers, "The aspect relevant to scope of liability provides that an actor whose tortious conduct puts the actor or another at risk, is subject to liability to a third person who is injured while attempting to come to the aid of the actor or the other imperiled person." § 32 cmt. b (2005). Musselman's entry onto the trail, the district court found, was a response to the peril created by the Service to warn or give aid to other snowmobilers. As such, it was a foreseeable consequence of the Service's negligence.

---

[6]"Danger invites rescue. The cry of distress is the summons to relief. The law does not ignore these reactions of the mind in tracing conduct to its consequences. It recognizes them as normal. It places their effects within the range of the natural and probable." *Wagner v. Int'l Ry. Co.*, 133 N.E. 437, 437 (N.Y. 1921) (Cardozo, J.).

## V.  NOTICE

The clerk of this court shall forward a copy of this order, under official seal, to the Montana Supreme Court, along with copies of all briefs and excerpts of record that have been filed with this court. The parties shall notify the clerk of this court within fourteen (14) days of any decision by the Montana Supreme Court to accept or to decline certification. If the Montana Supreme Court accepts certification, the parties shall then notify the clerk of this court within fourteen (14) days of the issuance of the Court's opinion. Submission of the questions presented in this appeal will be vacated by separate order pending the Montana Supreme Court's response to this request.

## VI.  COUNSEL LIST

The following is a list of counsel appearing this matter:

Counsel for Plaintiffs/Appellants Lori Oberson, Legal Guardian for Brian Musselman, Kimberlee Musselman, individually and as Natural Mother of Devon Musselman, a minor,

    Tom L. Lewis
    Lewis Slovak & Kovacich
    P.O. Box 2325
    Great Falls, MT 59403
and
    Andrew D. Huppert
    Petit Hock & Huppert
    P.O. Box 8718
    111 N. Higgins Avenue
    Missoula, MT 59807

Counsel for Defendant/Third-Party Plaintiff/ Appellee United States Department of Agriculture, Forest Service

    Bernard F. Hubley
    USHE - Office of the U.S. Attorney

901 Front Street
Helena, MT 59626

and

H. Thomas Byron, III
U.S. Department of Justice
Civil Division/Appellate Staff
950 Pennsylvania Avenue, NW
Washington, DC 20530-0001

Counsel for Defendant/Third-Party Plaintiff State of Montana, by and through the Department of Fish, Wildlife and Parks

Lucy T. France
Garlington Lohn & Robinson, PLLP
P.O. Box 7909
199 West Pine
Missoula, MT 59807-7909

Counsel for Defendant/Third-Party Plaintiff West Yellowstone Chamber of Commerce

Gig A. Tollefsen
Berg Lilly & Tollefsen
1 West Main Street
Bozeman, MT 59715

Counsel for Third-Party Defendant Jamie Louis Leinberger

Jamie Louis Leinberger
303 South Dean
Bay City, MI 48706

Counsel for Third Party Defendant Patrick B. Kalahar

Marshal L. Mickelson
Corette Pohlman Allen Black & Carlson
Mayer Building
129 West Park Street
P.O. Box 509
Butte, MT 59703

Third-Party Defendant Tim A. Johnson

No Appearance

Respectfully submitted,

Ronald M. Gould, Marsha S. Berzon
Circuit Judges and
William W Schwarzer, Senior United
States District Judge for the Northern
District of California, sitting by
designation

Ronald M. Gould, Circuit Judge,
Presiding